In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3671

JACK GREEN, INDIVIDUALLY AND AS TRUSTEE, STANLEY
SIMON, TRUSTEE, AND NORMA EVANS,

*Plaintiffs-Appellants,*

*v.*

NUVEEN ADVISORY CORP.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 5255—**Ronald A. Guzman**, *Judge.*

ARGUED MAY 15, 2002—DECIDED JULY 8, 2002

Before FLAUM, *Chief Judge*, and BAUER and RIPPLE,
*Circuit Judges.*

FLAUM, *Chief Judge.* The plaintiffs in this case are
common shareholders of six closed-end, tax-exempt munici-
pal bond funds. They allege that Nuveen, the funds' invest-
ment adviser, breached its fiduciary duty under §36(b) of
the Investment Company Act of 1940 ("ICA" or "the Act") by
receiving compensation based on a percentage of the daily
net assets of the funds. Such an arrangement, plaintiffs
contend, creates an inherent conflict of interest in violation
of the Act. The district court granted summary judgment in

favor of the defendant, finding that the plaintiffs failed to produce evidence establishing a breach of fiduciary duty under §36(b). For the reasons stated herein, we affirm the decision of the district court.

## I. Background

The six funds at issue are closed-end,[1] tax-exempt, leveraged[2] companies that invest in tax-free municipal bonds. The stated primary objective of the funds is to provide shareholders current income exempt from regular federal income tax. The stated secondary objective is to enhance portfolio value relative to the municipal bond market "through investments in tax-exempt Municipal Obligations that, in the opinion of the adviser, are underrated or undervalued or that represent municipal market sectors that are undervalued."

---

[1]   A closed-end investment company, unlike a traditional open-end mutual fund, has fixed capitalization and may sell only the number of shares of its own stock as originally authorized. It does not redeem its securities at the option of the shareholder. Shares of a closed-end fund are traded on a secondary market; that is, its stock, like that of any publicly owned corporation, is usually listed on a national exchange. The most pertinent difference between open- and closed-end investment companies is that closed-end funds are authorized under the ICA to use leverage to increase the stream of current income through the sale of preferred stock so long as there is 200% asset coverage for these securities. 15 U.S.C. §80a-18(a)(2).

[2]   Leverage exists "when an investor achieves the right to a return on a capital base that exceeds the investment which he has personally contributed to the entity or instrument achieving a return." Securities Trading Practices of Registered Investment Companies, IC-10666 (Apr. 18, 1979).

Each of the funds uses leverage to increase the amount of current income generated. That is, each of the funds issues preferred stock, used as a leveraging tool, as well as common stock.[3] The sale of common stock provides the majority of the capital with which the funds purchase long-term municipal bonds. The proceeds from the sale of preferred stock, sold at a dividend rate that is based upon short-term tax-exempt interest rates, are invested into additional long-term municipal bonds that pay rates of return that exceed the preferred-share dividend amount. The difference between the dividend paid to the preferred shareholders and these long-term interest rates amounts to additional income to common shareholders. So long as the long-term rates exceed the short-term dividend rates, which they do under normal market conditions, common shareholders receive greater current income than they would if the identical fund were not leveraged.[4] It is undisputed in this case that the long-term always exceeded the short-term rates. The Nuveen funds were leveraged for the entire time period in question.

Being a common shareholder of a leveraged investment company is not without risks. The dividends and values of preferred shares are set; the holders of preferred shares

---

[3] The six Nuveen funds are leveraged through the issuance of a preferred class of stock. The Act also permits closed-end funds to attain leverage by issuing debt securities so long as 300% asset coverage exists. 15 U.S.C. §80a-18(a)(1). Debt-leveraged investment companies generally compute advisory compensation without regard to leverage because debt is considered a liability under Generally Accepted Accounting Principals ("GAAP") and is subtracted from gross assets when net assets—upon which the advisers' fees are based—are determined.

[4] The greater the difference between long-term and short-term rates, the greater the increase in current income to the common shareholders.

always have a prior claim on the funds' assets. Therefore, a decrease in the value of those assets is borne only by the holders of common shares. Generally, the more highly leveraged the fund, the greater the risk of loss resulting from decreased portfolio value. Each of the six funds' prospectuses informed its common shareholders that leverage creates increased volatility in the value of their shares.[5]

Under the ICA, each investment company must have a board of directors, at least 40% of which is disinterested from the fund and its advisers. A majority of the directors of each of the funds at issue in this case is unaffiliated with Nuveen. The directors maintained ultimate control over the extent of the funds' leverage and the decisions as to whether to deleverage at a given time; they did, however, rely upon Nuveen for recommendations on leverage decisions.

---

[5] This inherent risk that accompanies investing in closed-end leveraged funds was disclosed to shareholders in other publications as well. For example, the April 30, 1995 semiannual report for three of the funds states:

> This period of unusually high volatility and uncertainty has brought home a basic fact about fixed-income securities: interest rates are subject to change, and sometimes the changes can have dramatic effects on net asset values. At Nuveen, we believe that the best approach to tax-free investing . . . is to focus on quality and income dependability. By this standard . . . your Fund continued to meet its objectives well, providing an attractive level of tax-free income while holding portfolio values well in light of market conditions. . . . The fact that your Fund is leveraged means that its net asset value per share will be somewhat more sensitive to interest rate changes . . . than unleveraged funds . . . . Through our value approach to investing . . . we will continue to pursue . . . attractive tax-free income and the enhancement of portfolio value relative to the municipal bond market.

Nuveen operates and manages the funds in question. Its compensation is based on a percentage of the daily net assets of the funds, including the value of assets attributable to outstanding preferred shares.[6] Thus, assuming the number of outstanding common shares remains fixed, the more highly leveraged the fund, the higher Nuveen's compensation. The six funds issued preferred shares equaling approximately 35% of the funds' total assets to create leverage. Because an adviser's services and costs increase, to some extent, as its fund's assets increase, almost all investment companies and 100% of the 202 current closed-end, leveraged municipal bond funds, base adviser compensation on net or total assets.

## II. Discussion

We review the district court's grant of summary judgment *de novo*, construing all of the facts and reasonable inferences that can be drawn from those facts in favor of the nonmoving party. *See Central States, Southeast & Southwest Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 894 (7th Cir. 2001). A grant of summary judgment is appropriate if the pleadings, affidavits, and other supporting materials leave no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

---

[6] According to GAAP, net assets equal assets minus liabilities. Equity, such as preferred stock, is not subtracted from assets in this computation. To account for economies of scale, the percentage of the daily net asset value that Nuveen receives decreases as that value increases. In 1995, Nuveen received .65 of 1% for the first $125 million in net assets, .6375 for the next $125 million, .625 for the next $250 million, .6125 for the next $500 million, .6 for the next billion dollars, and .5875 for net assets over $2 billion.

The logic of the plaintiffs' underlying contention is easy to understand, but their conclusion is ultimately false. With the current compensation structure, the more highly leveraged a closed-end fund, the more compensation its advisers receive. A fund's interests may not always be best served by being highly leveraged.[7] Therefore, the plaintiffs conclude, assuming that the funds' advisers are the decision makers—an assumption that has proven incorrect in this case, as will be discussed below—the advisers have a personal monetary incentive to act in a manner that may not be best for the common shareholders of the funds, creating an impermissible conflict of interest.

This incentive alone, the plaintiffs argue, violates the ICA §36(b). Under this provision, an investment company's adviser owes the shareholders a fiduciary duty "with respect to the receipt of compensation for services." 15 U.S.C. §80a-35(b). Two primary issues arise with regard to this contention: first, does the alleged conflict of interest alone violate §36(b) of the Act, and second, does such a conflict exist in this case. The district court answered both questions in the negative.

Congress enacted the ICA in 1940 to provide a comprehensive federal program to address mismanagement and abuse of investment companies that had become prevalent in the depression era. William P. Rogers and James N. Benedict, *Money Market Fund Management Fees: How Much is Too Much?*, 57 NYU L. Rev. 1059 (Dec. 1982). Because Congress recognized the potential for a fund's adviser to self-deal under a compensation scheme based on a percentage of fund assets, it mandated that forty percent of a fund's board of directors be unaffiliated with the fund's

---

[7] As discussed above, plaintiffs have produced no evidence that, in this case, the funds' objectives actually would have been better served by deleveraging.

adviser. *Id.*; 15 U.S.C. §80a-10(a). These independent directors were directly accountable to shareholders and were, among other duties, responsible for determining adviser compensation and approving, by majority, all agreements with advisers. 15 U.S.C. §80a-15(c). In 1970, recognizing that the potential for abuse called for greater and more easily enforced protection for investors, Congress amended the Act. *Green v. Fund Asset Management, L.P.*, No. 01-2736, 2002 WL 596827 (3d Cir. Apr. 18, 2002). The ICA, as amended, included §36(b) which created a statutorily imposed fiduciary duty upon advisers regarding their compensation.

Plaintiffs argue that this provision prohibits a closed-end fund's adviser from receiving fees that are based upon a percentage of the fund's assets because the inherent conflict of interest in such an arrangement breaches its fiduciary duty. Nuveen had a duty, they contend, to avoid a fee structure that creates an incentive to consider its own interests when making leverage decisions for the funds. We disagree. First, while an abuse of this inherent conflict may violate §36(b), its mere existence does not. This holding comports with congressional intent as well as the case law that has developed interpreting the Act. Second, the evidence shows that Nuveen did not have the authority to make final leveraging decisions for the funds.

Although §36(b) does not explain the term "fiduciary duty," the legislative history surrounding the ICA's 1970 amendment makes clear that the enactment of the provision was not "intended to provide a basis . . . to undertake a general revision of the practices or structures of the investment company industry." H.R. Rep. No. 91-1382 (1970). Congress was well aware, when it amended the Act, that the most common investment company adviser compensation scheme was based on a percentage of assets. "[Advisers'] fees are usually calculated at a percentage of the funds'

net assets and fluctuate with the value of the funds' portfolio." S. Rep. No. 91-184 (1969). The very awareness of this structure, and the potential for abuse carried with it by creating various monetary incentives for advisers, prompted Congress to impose a fiduciary duty. By passing §36(b), it attempted to diminish the risk of adviser self-dealing under the predominant industry practice, not to fundamentally revise the system itself. *See Fund Asset Mgmt., L.P.*, 2002 WL 596827 at *2. Moreover, Congress has amended the Act, including §36(b), several times, never indicating that the fee structure as applied to leveraged, closed-end funds was impermissible. The existence of a compensation scheme that could create an incentive for advisers to keep an investment fund leveraged to an extent that may not be best for the fund's common shareholders does not, by itself, create a breach of fiduciary duty under ICA §36(b).[8] Congress en-

---

[8] We note that although two of our sister circuits have held that §36(b) is limited to allegations of excessive fees relative to services provided, *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321 (4th Cir. 2001); *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923 (2d Cir. 1982), we, like the Third Circuit, *see Green v. Fund Asset Mgmt.*, 2002 WL 596827, view the provision slightly more broadly. For example, in the improbable case that: 1) the adviser to a closed-end, equity-leveraged fund with an asset-based compensation scheme received additional fees by increasing or maintaining leverage when it predicted that short-term interest rates would exceed long-term rates for a protracted period of time, causing the common shareholders to lose current income; and 2) the adviser, not the board of directors, made final leveraging decisions, a common shareholder's §36(b) claim might survive summary judgment.

Even in that case, it is important to remember, the receipt of fees and the compensation structure, not the leveraging decision, would be at issue, and damages would be limited to the amount of compensation received. 15 U.S.C. §80a-35(b); *see also, e.g., In re*

(continued...)

acted §36(b) to provide a narrow federal remedy that "is significantly more circumscribed than common law fiduciary duty doctrines . . . ." *Id.* at \*2. For example, a shareholder may sue only the recipient of the fees in question and has the burden of proving the breach of duty; recovery is limited to actual damages; and damages are recoverable only for the one-year period before the filing of the action. 15 U.S.C. §80b. Although the existence of a potential conflict like the one plaintiffs assert may create a valid breach of fiduciary duty claim under the common law standard— a question we do not entertain—it does not violate ICA §36(b).

Moreover, §205 of the Investment Advisers Act ("IAA"), a companion statute to the ICA, expressly approves of investment compensation contracts which, like this one, are "based upon the total value of a fund over a definite period." 15 U.S.C. §80b-5. The plaintiffs argue that in 1970, closed-end, tax-exempt leveraged funds like the ones in question did not exist so the IAA's sanction of asset-based compensation does not apply. Shareholders of funds with investment advisers subject to the IAA, they contend, are free to switch advisers and to make his or her own decision to borrow money to buy stock. This argument must fail. The IAA clearly applies to advisers such as Nuveen. *See Zinn v.*

---

[8] (...continued)
*Nuveen Fund Litig.*, 1996 WL 328006 (June 11, 1996) ("While §36(b) may regulate more than the mere terms of the fee arrangement between the investment adviser and the investment company, the court does not believe that it regulates the propriety of the transactions for which fees are paid. Rather, §36(b) only imposes a direct fiduciary duty on the investment adviser with 'respect to the receipt of compensation or payment for services.' "). Because the question raised by the hypothetical case above is not before us today, however, we decline to address the merits of the issue.

*Parrish*, 644 F.2d 360, 364 (7th Cir. 1981) (IAA covers any entity that receives compensation for giving investment advice.) Congress has amended the IAA several times since the appearance of funds like Nuveen's, and has not limited or shown any intent to restrict the application of §205.

The plaintiffs in this case produce no evidence showing that Nuveen actually abused its position, thus breaching its §36(b) fiduciary duty. Although they attempt in a secondary argument to show an actual conflict resulting from a leveraging decision in 1994, this time period was before they were shareholders, and before the Act's recoverable one-year period began. This contention, therefore, carries no weight. Moreover, even if these procedural bars were ignored, plaintiffs fail to show that an actual conflict existed. They assert that the advisers received compensation in breach of their fiduciary duty by maintaining preferred-share leverage to increase their fees, resulting in a decrease in portfolio value. They do not dispute, however, that any loss was unrealized, offset by leveraged-enhanced gains the following year, that they would have sacrificed additional income had the funds been deleveraged, that even in the year they reference, the funds outperformed taxable bond funds that did reduce leverage, and that the funds' prospectuses adequately informed them that the funds use leverage which creates increased volatility in portfolio value. The funds each have a secondary objective of enhancing portfolio value through investing in underrated or undervalued municipal bonds, not through leverage decisions. Moreover, the plaintiffs fail to show that Nuveen predicted the interest rate changes when the funds decided to maintain leverage in 1994; therefore, its argument that the advisers made a decision that negatively impacted the common shareholders in order to increase compensation must fail. If the plaintiffs' real complaint is that the advisers (or the directors) made such poor leveraging decisions that a loss to common shareholders resulted, they need to seek recourse "under other

sections of the ICA, or alternatively under state law." *Migdal*, 248 F.3d at 328.[9] Plaintiffs alleged an ICA §36(a) violation which the district court dismissed for failure to bring derivatively. The have neither appealed that ruling nor attempted to bring a derivative action.

Throughout this litigation, the plaintiffs have maintained that if the advisers controlled the use of leverage, the fee structure itself would violate ICA §36(b) because of the impermissible incentive it creates. Even if we agreed with this contention, the undisputed facts show that it was *not* Nuveen who controlled the use of leverage, but the funds' directors. The allegedly improper incentive, therefore, is minimal. The plaintiffs do not dispute the fact that the board of directors, the majority of whom were unaffiliated with Nuveen, had ultimate control over the extent of the funds' leverage; they contend only that the directors relied on Nuveen's recommendations. Assuming that this is true, however, it remains undisputed that Nuveen did not have the authority to increase or decrease leverage—that power lay only with the independent board of directors. Summary judgment was appropriate based on this reason alone.

Finally, for each applicable year, the disinterested directors for each of the funds approved the advisory compensation agreements at issue. Because Congress expressly ordered that we give board of director approval "such consideration . . . as is deemed appropriate under all the circumstances," 15 U.S.C. §80a-35(b)(2), we find that this factor, too, supports the district court's summary judgment ruling.

---

[9] ICA §36(a) creates a fiduciary duty involving directors' or advisers' personal misconduct. It is unclear whether individual shareholders have an implied right of action under §36(a) to bring a derivative suit. *Boland v. Engle*, 113 F.3d 706 (7th Cir. 1997). We do not suggest that they do or do not; we merely state that fund mismanagement issues are within the purview of §36(a), not §36(b).

For the reasons stated herein, we AFFIRM the decision of the district court.

A true Copy:

       Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-97-C-006—7-8-02