In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 07-1624

JERRY N. JONES, MARY F. JONES,
and ARLINE WINERMAN,

*Plaintiffs-Appellants*,

*v.*

HARRIS ASSOCIATES L.P.,

*Defendant-Appellee*.

_____

On Petition for Rehearing and
Rehearing En Banc

_____

DECIDED AUGUST 8, 2008

_____

Before EASTERBROOK, *Chief Judge*, and KANNE and EVANS,
*Circuit Judges*.

PER CURIAM. The panel has voted unanimously to deny
the petition for rehearing. A judge in active service
called for a vote on the suggestion for rehearing en banc.
A majority did not favor rehearing en banc, and the
petition therefore is denied. Circuit Judge Ripple did not
participate in the consideration or decision of this case.

POSNER, *Circuit Judge*, with whom Circuit Judges ROVNER, WOOD, WILLIAMS, and TINDER join, dissenting from denial of rehearing en banc.

This case merits the attention of the full court. The panel rejected the approach taken by the Second Circuit in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982), to deciding whether a mutual fund adviser has breached his fiduciary duty to the fund, the duty created by section 36(b) of the Investment Company Act, 15 U.S.C. §§ 80a-1 *et seq*. *Gartenberg* permits a court to consider, as a factor in determining such a breach, whether the fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." 694 F.2d at 928. The panel opinion states that it "now disapprove[s] the *Gartenberg* approach. . . . A fiduciary must make full disclosure and play no tricks but is not subject to a cap on compensation." *Jones v. Harris Associates L.P.*, 527 F.3d 627, 632 (7th Cir. 2008).

The opinion says that this court had previously suggested that the *Gartenberg* approach "is wanting." *Id*. It cites *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 743 n. 8 (7th Cir. 2002), for this proposition, but neither in footnote 8 nor elsewhere in that opinion is there any suggestion that *Gartenberg*'s treatment of the issue of excessive fees is incorrect; *Green* was not an excessive-fee case. The panel cites another *Green* opinion, *Green v. Fund Asset Management, L.P.*, 286 F.3d 682 (3d Cir. 2002), as suggesting disagreement with *Gartenberg*, but again the amount of compensation was not at issue.

*Jones* is the only appellate opinion noted in Westlaw as disagreeing with *Gartenberg*; there is a slew of positive citations. See, e.g., *Migdal v. Rowe Price-Fleming Int'l, Inc.*,

248 F.3d 321, 326-27 (4th Cir. 2001); *In re Salomon Smith Barney Mutual Fund Fees Litigation*, 528 F. Supp. 2d 332, 336-37 (S.D.N.Y. 2007); *Gallus v. Ameriprise Financial, Inc.*, 497 F. Supp. 2d 974, 979 (D. Minn. 2007); *Sins v. Janus Capital Management, LLC*, 2006 WL 3746130, at *2 (D. Colo. Dec. 15, 2006); *Siemers v. Wells Fargo & Co.*, 2006 WL 2355411, at *15-16 (N.D. Cal. Aug. 14, 2006); *Hunt v. Invesco Funds Group, Inc.*, 2006 WL 1581846, at *2 (S.D. Tex. June 5, 2006); *Stegall v. Ladner*, 394 F. Supp. 2d 358, 373-74 (D. Mass. 2005); *Becherer v. Burt*, 2003 WL 24260305, at *2 (S.D. Ill. Mar. 6, 2003); *Millenco L.P. v. MEVC Advisors, Inc.*, 2002 WL 31051604, at *3 (D. Del. Aug. 21, 2002). The Coates and Hubbard article that the panel cites, John C. Coates & R. Glenn Hubbard, "Competition in the Mutual Fund Industry: Evidence and Implications for Policy," 33 *J. Corp. L.* 151 (2007), expressly approves *Gartenberg*, while seeking to fine tune judicial interpretations of some *Gartenberg* dicta. In the section of the article captioned "Refinements to *Gartenberg*," the authors state that "radical shifts in existing law, or for sweeping new laws and regulations, are unwise on the ground that the case has not been made that the existing framework for regulation of funds and advisory fees is intrinsically flawed." *Id*. at 213. It's not as if *Gartenberg* has proved to be too hard on fund advisers. "Subsequent litigation [after *Gartenberg*] in excessive fee cases has resulted almost uniformly in judgments for the defendants . . . although there have been some notable settlements wherein defendants have agreed to prospective reduction in the fee schedule." James D. Cox et al., *Securities Regulation: Cases and Materials* 1211 (3d ed. 2001); see also James D. Cox & John W. Payne, "Mutual Fund Expense Disclosures: A Behavioral Perspective," 83 *Wash. U. L.Q.* 907, 923 (2005).

The panel bases its rejection of *Gartenberg* mainly on an economic analysis that is ripe for reexamination on the basis of growing indications that executive compensation in large publicly traded firms often is excessive because of the feeble incentives of boards of directors to police compensation. See, e.g., Lucian Bebchuk & Jesse Fried, *Pay without Performance*: *The Unfilfilled Promise of Executive Compensation* 23-44 (2004); Charles A. O'Reilly III & Brian G.M. Main, "It's More Than Simple Economics," 36 *Organizational Dynamics* 1 (2007); Ivan E. Brick, Oded Palmon & John K. Wald, "CEO Compensation, Director Compensation, and Firm Performance: Evidence of Cronyism?," 12 *J. Corp. Finance* 403 (2006); Arthur Levitt, Jr., "Corporate Culture and the Problem of Executive Compensation," 30 *J. Corp. Law* 749, 750 (2005); Gary Wilson, "How to Rein in the Imperial CEO," *Wall St. J.*, July 9, 2008, p. A15; Joann S. Lublin, "Boards Flex Their Pay Muscles: Directors Are Increasingly Exercising More Clout in Setting CEO Compensation; and in Some Cases, the Boss Is Actually Feeling a Little Pain," *Wall St. J.*, Apr. 14, 2008, p. R1; Ben Stein, "In the Boardroom, Every Back Gets Scratched," *N.Y. Times*, Apr. 6, 2008, p. B9. Directors are often CEOs of other companies and naturally think that CEOs should be well paid. And often they are picked by the CEO. Compensation consulting firms, which provide cover for generous compensation packages voted by boards of directors, have a conflict of interest because they are paid not only for their compensation advice but for other services to the firm—services for which they are hired by the officers whose compensation they advised on. Bebchuk & Fried, *supra*, at 37-39; Gretchen Morgenson, "How Big a Payday for the Pay Consultants?," *N.Y. Times*, June 22, 2008, p. B1; Neil Weinberg, Michael Maiello & David K. Randall, "Paying for Failure," *Forbes*, May 19, 2008, p. 114; Joann S. Lublin, "Conflict Concerns

Benefit Independent Pay Advisors," *Wall St. J.*, Dec. 10, 2007, p. B3; Warren E. Buffet, "Letter to the Shareholders of Berkshire Hathaway, Inc.," Feb. 27, 2004, p. 8, www.berkshirehathaway.com/letters/2003ltr.pdf (visited July 28, 2008).

Competition in product and capital markets can't be counted on to solve the problem because the same structure of incentives operates on all large corporations and similar entities, including mutual funds. Mutual funds are a component of the financial services industry, where abuses have been rampant, as is more evident now than it was when Coates and Hubbard wrote their article. A business school professor at Northwestern University recently observed that "business connections can mitigate agency conflicts by facilitating efficient information transfers, but can also be channels for inefficient favoritism." She found "evidence that connections among agents in [the mutual fund industry] foster favoritism, to the detriment of investors. Fund directors and advisory firms that manage the funds hire each other preferentially based on past interactions. When directors and the management are more connected, advisors capture more rents and are monitored by the board less intensely. These findings support recent calls for more disclosure regarding the negotiation of advisory contracts by fund boards." Camelia M. Kuhnen, "Social Networks, Corporate Governance and Contracting in the Mutual Fund Industry" (Mar. 1, 2007), http://ssrn.com/abstract=849705 (visited July 28, 2008). The SEC's Office of Economic Analysis (the principal adviser to the SEC on the economic aspects of regulatory issues) believes that mutual fund "boards with a greater proportion of independent directors are more likely to negotiate and approve lower fees, merge

poorly performing funds more quickly or provide greater investor protection from late-trading and market timing," although "broad cross-sectional analysis reveals little consistent evidence that board composition is related to lower fees and higher returns for fund shareholders." "OEA Memorandum: Literature Review on Independent Mutual Fund Chairs and Directors," Dec. 29, 2006, www.404.gov/rules/proposed/s70304/oeamemo122906-litreview.pdf (visited July 28, 2008).

A particular concern in this case is the adviser's charging its captive funds more than twice what it charges independent funds. According to the figures in the panel opinion, the captives are charged one percent of the first $2 billion in assets while the independents are charged roughly one-half of one percent for the first $500 million and roughly one-third of one percent for everything above. The panel opinion throws out some suggestions on why this difference may be justified, but the suggestions are offered purely as speculation, rather than anything having an evidentiary or empirical basis. And there is no doubt that the captive funds are indeed captive. The Oakmark-Harris relationship matches the arrangement described in the Senate Report accompanying § 36(b): a fund "organized by its investment adviser which provides it with almost all management services." S. Rep. No. 184, 91st Cong., 1st Sess. 41 (1969), quoted in *Green v. Fund Asset Management, L.P.*, *supra*, 286 F.3d at 685. Financial managers from Harris founded the Oakmark family of funds in 1991, and each year since then the Oakmark Board of Trustees has reselected Harris as the fund's adviser. Harris manages the entire Oakmark portfolio, which consists of seven funds. The Oakmark prospectus describes the relationship this way: "Subject to the overall authority

of the board of trustees, [Harris Associates] furnishes continuous investment supervision and management to the Funds and also furnishes office space, equipment, and management personnel." The Oakmark Funds, "Prospectus," Jan. 28, 2008, p. 36, www.oakmark.com/fundlit/ literature.asp?selected=Prospectus# (visited July 28, 2008). Recall Professor Kuhnen's observation that "when directors and the management are more connected, advisors capture more rents and are monitored by the board less intensely."

The panel opinion says that the fact "that mutual funds are 'captives' of investment advisers does not curtail this competition. An adviser can't make money from its captive fund if high fees drive investors away." 527 F.3d at 632. That's true; but will high fees drive investors away? "[T]he chief reason for substantial advisory fee level differences between equity pension fund portfolio managers and equity mutual fund portfolio managers is that advisory fees in the pension field are subject to a marketplace where arm's-length bargaining occurs. As a rule, [mutual] fund shareholders neither benefit from arm's-length bargaining nor from prices that approximate those that arm's-length bargaining would yield were it the norm." John P. Freeman & Stewart L. Brown, "Mutual Fund Advisory Fees: The Cost of Conflicts of Interest," 26 *J. Corp. L.* 609, 634 (2001).

The panel opinion acknowledges that the level of compensation of trustees could be "so unusual that a court will infer that deceit must have occurred, or that the persons responsible for [the] decision have abdicated." 527 F.3d at 632. Compensation that is "so unusual" might not seem to differ materially from compensation that is "so disproportionately large." But although one industry

commentator has suggested that "courts may . . . conclude that in fact what the Court of Appeals has done [in *Jones*] is merely articulate the *Gartenberg* standard in a different way," "Seventh Circuit 'Disapproves' Gartenberg, But Is This New Approach Fundamentally Different?," May 27, 2008, www.bingham.com/Media.aspx?MediaID=7004 (visited July 28, 2008), this misses an important difference between the *Gartenberg* approach and the panel's approach. The panel's "so unusual" standard is to be applied solely by comparing the adviser's fee with the fees charged by other mutual fund advisers. *Gartenberg*'s "so dispropor- tionately large" standard is rightly not so limited. The governance structure that enables mutual fund advisers to charge exorbitant fees is industry-wide, so the panel's comparability approach would if widely followed allow those fees to become the industry's floor. And in this case there was an alternative comparison, rejected by the panel on the basis of airy speculation—comparison of the fees that Harris charges independent funds with the much higher fees that it charges the funds it controls.

The panel opinion points out that courts do not review corporate salaries for excessiveness. That misses the point, which is that unreasonable compensation can be evidence of a breach of fiduciary duty.

The opinion is recognized to have created a circuit split, although the panel did not acknowledge this or circulate its opinion to the full court in advance of publication, as is required when a panel creates a circuit split. See, e.g., "Fund Alert: Seventh Circuit Rejects *Gartenberg* Approach to Determining the Appropriateness of Mutual Fund Management Fees," May 2008, www.stradley.com/ newsletters.php?action=view&id=347; "Investment Management Alert: Seventh Circuit Court of Appeals

Rejects *Gartenberg*," June 2, 2008, www.drinkerbiddle.com/
files/Publication/f74b9bc2-9376-4b60-b732-
0242868a873c/Presentation/PublicationAttachment/be9
e677f-8b35-440a-8b53-022caedb13e0/Gartenberg.pdf;
"Email Alerts: It's Too Early to Disregard the *Gartenberg*
Factors During Advisory Fee Renewals," May 27, 2008,
www.wilmerhale.com/publications/whPubsDetail.aspx
?publication=8329; "Appeals Court Rejects Mutual Fund
Excessive Fee Claims, Adopting New Standard for Evalua-
tion of Fees," May 20, 2008, www.ropesgray.com/
litigationalert/?PublicationTypes=0c16874b-f94e-4696-
b607-de259b87a13f; "The Future of *Gartenberg*: A New
Approach in Evaluating Investment Advisor Fees," May
2008, www.paulhastings.com/assets/publications/
919.pdf?wt.mc_ID=919.pdf. (All these web sites were
visited on July 28, 2008.)

The *outcome* of this case may be correct. The panel
opinion gives some reasons why, though one of them is
weak in its unelaborated form: that the funds managed by
Harris have grown faster than the industry norm. One
would need to know over what period they had grown
faster to know whether other than random factors were
at work. But the creation of a circuit split, the importance
of the issue to the mutual fund industry, and the one-sided
character of the panel's analysis warrant our hearing
the case en banc.