(Slip Opinion) OCTOBER TERM, 2009 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JONES ET AL. *v.* HARRIS ASSOCIATES L. P.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 08–586.   Argued November 2, 2009—Decided March 30, 2010

Petitioners, shareholders in mutual funds managed by respondent investment adviser, filed this suit alleging that respondent violated §36(b)(1) of the Investment Company Act of 1940, which imposes a "fiduciary duty [on investment advisers] with respect to the receipt of compensation for services," 15 U. S. C. §80a–35(b).  Granting respondent summary judgment, the District Court concluded that petitioners had not raised a triable issue of fact under the applicable standard set forth in *Gartenberg* v. *Merrill Lynch Asset Management, Inc.*, 694 F. 2d 923, 928 (CA2): "[T]he test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in light of all of the surrounding circumstances. . . . To be guilty of a violation of §36(b), . . . the adviser must charge a fee that is so disproportionately large it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  Rejecting the *Gartenberg* standard, the Seventh Circuit panel affirmed based on different reasoning.

*Held:* Based on §36(b)'s terms and the role that a shareholder action for breach of the investment adviser's fiduciary duty plays in the Act's overall structure, *Gartenberg* applied the correct standard.  Pp. 7–17.

   (a) A consensus has developed regarding the standard *Gartenberg* set forth over 25 years ago: The standard has been adopted by other federal courts, and the Securities and Exchange Commission's regulations have recognized, and formalized, *Gartenberg*-like factors. Both petitioners and respondents generally endorse the *Gartenberg* approach but disagree in some respects about its meaning.  Pp. 7–9.

   (b) Section 36(b)'s "fiduciary duty" phrase finds its meaning in *Pepper* v. *Linton*, 308 U. S. 295, 306–307, where the Court discussed the

concept in the analogous bankruptcy context: "The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside." *Gartenberg*'s approach fully incorporates this understanding, insisting that all relevant circumstances be taken into account and using the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees. Pp. 9–11.

(c) *Gartenberg*'s approach also reflects §36(b)'s place in the statutory scheme and, in particular, its relationship to the other protections the Act affords investors. Under the Act, scrutiny of investment adviser compensation by a fully informed mutual fund board, see *Burks* v. *Lasker*, 441 U. S. 471, 482, and shareholder suits under §36(b) are mutually reinforcing but independent mechanisms for controlling adviser conflicts of interest, see *Daily Income Fund, Inc.* v. *Fox*, 464 U. S. 523, 541. In recognition of the disinterested directors' role, the Act instructs courts to give board approval of an adviser's compensation "such consideration . . . as is deemed appropriate under all the circumstances." §80a–35(b)(1). It may be inferred from this formulation that (1) a measure of deference to a board's judgment may be appropriate in some instances, and (2) the appropriate measure of deference varies depending on the circumstances. *Gartenberg* heeds these precepts. See 694 F. 2d, at 930. Pp. 11–12.

(d) The Court resolves the parties' disagreements on several important questions. First, since the Act requires consideration of all relevant factors, §80a–35(b)(2), courts must give comparisons between the fees an investment adviser charges a captive mutual fund and the fees it charges its independent clients the weight they merit in light of the similarities and differences between the services the clients in question require. In doing so, the Court must be wary of inapt comparisons based on significant differences between those services and must be mindful that the Act does not necessarily ensure fee parity between the two types of clients. However, courts should not rely too heavily on comparisons with fees charged mutual funds by other advisers, which may not result from arm's-length negotiations. Finally, a court's evaluation of an investment adviser's fiduciary duty must take into account both procedure and substance. Where disinterested directors consider all of the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if the court might weigh the factors differently. Cf. *Lasker,* 441 U. S., at 486. In contrast, where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome. *Id.,* at 484. *Gartenberg*'s "so disproportionately large" standard, 694 F. 2d, at

Syllabus

928, reflects Congress' choice to "rely largely upon [independent] 'watchdogs' to protect shareholders interests," *Lasker, supra*, at 482. Pp. 12–16.

(e) The Seventh Circuit erred in focusing on disclosure by investment advisers rather than the *Gartenberg* standard, which the panel rejected. That standard may lack sharp analytical clarity, but it accurately reflects the compromise embodied in §36(b) as to the appropriate method of testing investment adviser compensation, and it has provided a workable standard for nearly three decades. Pp. 16–17.

527 F. 3d 627, vacated and remanded.

ALITO, J., delivered the opinion for a unanimous Court. THOMAS, J., filed a concurring opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 08–586

---

## JERRY N. JONES, ET AL., PETITIONERS *v.* HARRIS ASSOCIATES L. P.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[March 30, 2010]

JUSTICE ALITO delivered the opinion of the Court.

We consider in this case what a mutual fund shareholder must prove in order to show that a mutual fund investment adviser breached the "fiduciary duty with respect to the receipt of compensation for services" that is imposed by §36(b) of the Investment Company Act of 1940, 15 U. S. C. §80a–35(b) (hereinafter §36(b)).

I

A

The Investment Company Act of 1940 (Act), 54 Stat. 789, 15 U. S. C. §80a–1 *et seq.*, regulates investment companies, including mutual funds. "A mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund." *Burks* v. *Lasker*, 441 U. S. 471, 480 (1979). The following arrangements are typical. A separate entity called an investment adviser creates the mutual fund, which may have no employees of its own. See *Kamen* v. *Kemper Financial Services, Inc.*, 500 U. S. 90, 93 (1991); *Daily Income Fund, Inc.* v. *Fox*, 464 U. S. 523, 536 (1984); *Burks*, 441 U. S., at 480–481. The adviser selects

the fund's directors, manages the fund's investments, and provides other services. See *id.,* at 481. Because of the relationship between a mutual fund and its investment adviser, the fund often "'cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.'" *Ibid.* (quoting S. Rep. No. 91–184, p. 5 (1969) (hereinafter S. Rep.)).

"Congress adopted the [Investment Company Act of 1940] because of its concern with the potential for abuse inherent in the structure of investment companies." *Daily Income Fund,* 464 U. S., at 536 (internal quotation marks omitted). Recognizing that the relationship between a fund and its investment adviser was "fraught with potential conflicts of interest," the Act created protections for mutual fund shareholders. *Id.,* at 536–538 (internal quotation marks omitted); *Burks, supra,* at 482–483. Among other things, the Act required that no more than 60 percent of a fund's directors could be affiliated with the adviser and that fees for investment advisers be approved by the directors and the shareholders of the fund. See §§10, 15(c), 54 Stat. 806, 813.

The growth of mutual funds in the 1950's and 1960's prompted studies of the 1940 Act's effectiveness in protecting investors. See *Daily Income Fund*, 464 U. S., at 537–538. Studies commissioned or authored by the Securities and Exchange Commission (SEC or Commission) identified problems relating to the independence of investment company boards and the compensation received by investment advisers. See *ibid.* In response to such concerns, Congress amended the Act in 1970 and bolstered shareholder protection in two primary ways.

First, the amendments strengthened the "cornerstone" of the Act's efforts to check conflicts of interest, the independence of mutual fund boards of directors, which nego-

tiate and scrutinize adviser compensation. *Burks, supra,* at 482. The amendments required that no more than 60 percent of a fund's directors be "persons who are interested persons," *e.g.,* that they have no interest in or affiliation with the investment adviser.[1] 15 U. S. C. §80a–10(a); §80a–2(a)(19); see also *Daily Income Fund, supra*, at 538. These board members are given "a host of special responsibilities." *Burks*, 441 U. S., at 482–483. In particular, they must "review and approve the contracts of the investment adviser" annually, *id.,* at 483, and a majority of these directors must approve an adviser's compensation, 15 U. S. C. §80a–15(c). Second, §36(b), 84 Stat. 1429, of the Act imposed upon investment advisers a "fiduciary duty" with respect to compensation received from a mutual fund, 15 U. S. C. §80a–35(b), and granted individual investors a private right of action for breach of that duty, *ibid.*

The "fiduciary duty" standard contained in §36(b) represented a delicate compromise. Prior to the adoption of the 1970 amendments, shareholders challenging investment adviser fees under state law were required to meet "common-law standards of corporate waste, under which an unreasonable or unfair fee might be approved unless the

_____

[1] An "affiliated person" includes (1) a person who owns, controls, or holds the power to vote 5 percent or more of the securities of the investment adviser; (2) an entity which the investment adviser owns, controls, or in which it holds the power to vote more than 5 percent of the securities; (3) any person directly or indirectly controlling, controlled by, or under common control with the investment adviser; (4) an officer, director, partner, copartner, or employee of the investment adviser; (5) an investment adviser or a member of the investment adviser's board of directors; or (6) the depositor of an unincorporated investment adviser. See §80a–2(a)(3). The Act defines "interested person" to include not only all affiliated persons but also a wider swath of people such as the immediate family of affiliated persons, interested persons of an underwriter or investment adviser, legal counsel for the company, and interested broker-dealers. §80a–2(a)(19).

court deemed it 'unconscionable' or 'shocking,'" and "security holders challenging adviser fees under the [Investment Company Act] itself had been required to prove gross abuse of trust." *Daily Income Fund*, 464 U. S., at 540, n. 12. Aiming to give shareholders a stronger remedy, the SEC proposed a provision that would have empowered the Commission to bring actions to challenge a fee that was not "reasonable" and to intervene in any similar action brought by or on behalf of an investment company. *Id.,* at 538. This approach was included in a bill that passed the House. H. R. 9510, 90th Cong., 1st Sess., §8(d) (1967); see also S. 1659, 90th Cong., 1st Sess., §8(d) (1967). Industry representatives, however, objected to this proposal, fearing that it "might in essence provide the Commission with ratemaking authority." *Daily Income Fund*, 464 U. S., at 538.

The provision that was ultimately enacted adopted "a different method of testing management compensation," *id.,* at 539 (quoting S. Rep., at 5 (internal quotation marks omitted)), that was more favorable to shareholders than the previously available remedies but that did not permit a compensation agreement to be reviewed in court for "reasonableness." This is the fiduciary duty standard in §36(b).

## B

Petitioners are shareholders in three different mutual funds managed by respondent Harris Associates L. P., an investment adviser. Petitioners filed this action in the Northern District of Illinois pursuant to §36(b) seeking damages, an injunction, and rescission of advisory agreements between Harris Associates and the mutual funds. The complaint alleged that Harris Associates had violated §36(b) by charging fees that were "disproportionate to the services rendered" and "not within the range of what would have been negotiated at arm's length in light of all

the surrounding circumstances." App. 52.

The District Court granted summary judgment for Harris Associates. Applying the standard adopted in *Gartenberg* v. *Merrill Lynch Asset Management, Inc.*, 694 F. 2d 923 (CA2 1982), the court concluded that petitioners had failed to raise a triable issue of fact as to "whether the fees charged . . . were so disproportionately large that they could not have been the result of arm's-length bargaining." App. to Pet. for Cert. 29a. The District Court assumed that it was relevant to compare the challenged fees with those that Harris Associates charged its other clients. *Id.,* at 30a. But in light of those comparisons as well as comparisons with fees charged by other investment advisers to similar mutual funds, the Court held that it could not reasonably be found that the challenged fees were outside the range that could have been the product of arm's-length bargaining. *Id.,* at 29a–32a.

A panel of the Seventh Circuit affirmed based on different reasoning, explicitly "disapprov[ing] the *Gartenberg* approach." 527 F. 3d 627, 632 (2008). Looking to trust law, the panel noted that, while a trustee "owes an obligation of candor in negotiation," a trustee, at the time of the creation of a trust, "may negotiate in his own interest and accept what the settlor or governance institution agrees to pay." *Ibid.* (citing Restatement (Second) of Trusts §242, and Comment *f*)). The panel thus reasoned that "[a] fiduciary duty differs from rate regulation. A fiduciary must make full disclosure and play no tricks but is not subject to a cap on compensation." 527 F. 3d, at 632. In the panel's view, the amount of an adviser's compensation would be relevant only if the compensation were "so unusual" as to give rise to an inference "that deceit must have occurred, or that the persons responsible for decision have abdicated." *Ibid.*

The panel argued that this understanding of §36(b) is consistent with the forces operating in the contemporary

mutual fund market.  Noting that "[t]oday thousands of mutual funds compete," the panel concluded that "sophisticated investors" shop for the funds that produce the best overall results, "mov[e] their money elsewhere" when fees are "excessive in relation to the results," and thus "create a competitive pressure" that generally keeps fees low.  *Id.,* at 633–634.  The panel faulted *Gartenberg* on the ground that it "relies too little on markets."  527 F. 3d, at 632.  And the panel firmly rejected a comparison between the fees that Harris Associates charged to the funds and the fees that Harris Associates charged other types of clients, observing that "[d]ifferent clients call for different commitments of time" and that costs, such as research, that may benefit several categories of clients "make it hard to draw inferences from fee levels."  *Id.,* at 634.

The Seventh Circuit denied rehearing en banc by an equally divided vote.  537 F. 3d 728 (2008).  The dissent from the denial of rehearing argued that the panel's rejection of *Gartenberg* was based "mainly on an economic analysis that is ripe for reexamination."  537 F. 3d, at 730 (opinion of Posner, J.).  Among other things, the dissent expressed concern that Harris Associates charged "its captive funds more than twice what it charges independent funds," and the dissent questioned whether high adviser fees actually drive investors away.  *Id.,* at 731.

We granted certiorari to resolve a split among the Courts of Appeals over the proper standard under §36(b).[2] 556 U. S. ___ (2009).

––––––––––

[2] See 527 F. 3d 627 (CA7 2008) (case below); *Migdal* v. *Rowe Price-Fleming Int'l, Inc.*, 248 F. 3d 321 (CA4 2001); *Krantz* v. *Prudential Invs. Fund Management LLC*, 305 F. 3d 140 (CA3 2002) *(per curiam).*  After we granted certiorari in this case, another Court of Appeals adopted the standard of *Gartenberg* v. *Merrill Lynch Asset Management, Inc.,* 694 F. 2d 923 (CA2 1982).  See *Gallus* v. *Ameriprise Financial, Inc.*, 561 F. 3d 816 (CA8 2009).

## II
### A

Since Congress amended the Investment Company Act in 1970, the mutual fund industry has experienced exponential growth. Assets under management increased from $38.2 billion in 1966 to over $9.6 trillion in 2008. The number of mutual fund investors grew from 3.5 million in 1965 to 92 million in 2008, and there are now more than 9,000 open- and closed-end funds.[3]

During this time, the standard for an investment adviser's fiduciary duty has remained an open question in our Court, but, until the Seventh Circuit's decision below, something of a consensus had developed regarding the standard set forth over 25 years ago in *Gartenberg, supra.* The *Gartenberg* standard has been adopted by other federal courts,[4] and "[t]he SEC's regulations have recognized, and formalized, *Gartenberg*-like factors." Brief for United States as *Amicus Curiae* 23. See 17 CFR §240.14a–101, Sched. 14A, Item 22, para. (c)(11)(i) (2009); 69 Fed. Reg. 39801, n. 31, 39807–39809 (2004). In the present case, both petitioners and respondent generally endorse the *Gartenberg* approach, although they disagree in some respects about its meaning.

In *Gartenberg*, the Second Circuit noted that Congress had not defined what it meant by a "fiduciary duty" with

———————

[3] Compare H. R. Rep. No. 2337, 89th Cong., 2d Sess., p. vii (1966), with Investment Company Institute, 2009 Fact Book 15, 20, 72 (49th ed.), online at http://www.icifactbook.org/pdf/2009_factbook.pdf (as visited Mar. 9, 2010, and available in Clerk of Court's case file).

[4] See, *e.g., Gallus, supra*, at 822–823; *Krantz, supra*; *In re Franklin Mut. Funds Fee Litigation*, 478 F. Supp. 2d 677, 683, 686 (NJ 2007); *Yameen* v. *Eaton Vance Distributors, Inc.*, 394 F. Supp. 2d 350, 355 (Mass. 2005); *Hunt* v. *Invesco Funds Group, Inc.*, No. H–04–2555, 2006 WL 1581846, *2 (SD Tex., June 5, 2006); *Siemers* v. *Wells Fargo & Co.*, No. C 05–4518 WHA, 2006 WL 2355411, *15–*16 (ND Cal., Aug. 14, 2006); see also *Amron* v. *Morgan Stanley Inv. Advisors Inc.*, 464 F. 3d 338, 340–341 (CA2 2006).

respect to compensation but concluded that "the test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." 694 F. 2d, at 928. The Second Circuit elaborated that, "[t]o be guilty of a violation of §36(b), . . . the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Ibid.* "To make this determination," the Court stated, "all pertinent facts must be weighed," *id.,* at 929, and the Court specifically mentioned "the adviser-manager's cost in providing the service, . . . the extent to which the adviser-manager realizes economies of scale as the fund grows larger, and the volume of orders which must be processed by the manager." *Id.,* at 930.[5] Observing that competition among advisers for the business of managing a fund may be "virtually nonexistent," the Court rejected the suggestion that "the principal factor to be considered in evaluating a fee's fairness is the price charged by other similar advisers to funds managed by them," although the Court did not suggest that this factor could not be "taken into account." *Id.,* at 929. The Court likewise rejected the "argument that the lower fees charged by investment advisers to large pension funds should be used as a criterion for determining fair advisory fees for money market funds,"

---

[5] Other factors cited by the *Gartenberg* court include (1) the nature and quality of the services provided to the fund and shareholders; (2) the profitability of the fund to the adviser; (3) any "fall-out financial benefits," those collateral benefits that accrue to the adviser because of its relationship with the mutual fund; (4) comparative fee structure (meaning a comparison of the fees with those paid by similar funds); and (5) the independence, expertise, care, and conscientiousness of the board in evaluating adviser compensation. 694 F. 2d, at 929–932 (internal quotation marks omitted).

since a "pension fund does not face the myriad of daily purchases and redemptions throughout the nation which must be handled by [a money market fund]." *Id.,* at 930, n. 3.[6]

### B

The meaning of §36(b)'s reference to "a fiduciary duty with respect to the receipt of compensation for services"[7] is hardly pellucid, but based on the terms of that provision and the role that a shareholder action for breach of that duty plays in the overall structure of the Act, we conclude that *Gartenberg* was correct in its basic formulation of what §36(b) requires: to face liability under §36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

### 1

We begin with the language of §36(b). As noted, the Seventh Circuit panel thought that the phrase "fiduciary duty" incorporates a standard taken from the law of trusts. Petitioners agree but maintain that the panel

―――――――

[6] A money market fund differs from a mutual fund in both the types of investments and the frequency of redemptions. A money market fund often invests in short-term money market securities, such as short-term securities of the United States Government or its agencies, bank certificates of deposit, and commercial paper. Investors can invest in such a fund for as little as a day, so, from the investor's perspective, the fund resembles an investment "more like a bank account than [a] traditional investment in securities." *Id.,* at 925.

[7] Section 36 (b) provides as follows:

"[T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser." 84 Stat. 1429 (codified at 15 U. S. C. §80a–35(b)).

identified the wrong trust-law standard. Instead of the standard that applies when a trustee and a settlor negotiate the trustee's fee at the time of the creation of a trust, petitioners invoke the standard that applies when a trustee seeks compensation after the trust is created. Brief for Petitioners 20–23, 35–37. A compensation agreement reached at that time, they point out, "'will not bind the beneficiary' if either 'the trustee failed to make a full disclosure of all circumstances affecting the agreement'" which he knew or should have known or if the agreement is unfair to the beneficiary. *Id.,* at 23 (quoting Restatement (Second) of Trusts §242, Comment *i*). Respondent, on the other hand, contends that the term "fiduciary" is not exclusive to the law of trusts, that the phrase means different things in different contexts, and that there is no reason to believe that §36(b) incorporates the specific meaning of the term in the law of trusts. Brief for Respondent 34–36.

We find it unnecessary to take sides in this dispute. In *Pepper* v. *Litton*, 308 U. S. 295 (1939), we discussed the meaning of the concept of fiduciary duty in a context that is analogous to that presented here, and we also looked to trust law. At issue in *Pepper* was whether a bankruptcy court could disallow a dominant or controlling shareholder's claim for compensation against a bankrupt corporation. Dominant or controlling shareholders, we held, are "fiduciar[ies]" whose "powers are powers [held] in trust." *Id.,* at 306. We then explained:

> "Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. . . . *The es-*

*sence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.* If it does not, equity will set it aside." *Id.,* at 306–307 (emphasis added; footnote omitted); see also *Geddes* v. *Anaconda Copper Mining Co.*, 254 U. S. 590, 599 (1921) (standard of fiduciary duty for interested directors).

We believe that this formulation expresses the meaning of the phrase "fiduciary duty" in §36(b), 84 Stat. 1429. The Investment Company Act modifies this duty in a significant way: it shifts the burden of proof from the fiduciary to the party claiming breach, 15 U. S. C. §80a–35(b)(1), to show that the fee is outside the range that arm's-length bargaining would produce.

The *Gartenberg* approach fully incorporates this understanding of the fiduciary duty as set out in *Pepper* and reflects §36(b)(1)'s imposition of the burden on the plaintiff. As noted, *Gartenberg* insists that all relevant circumstances be taken into account, see 694 F. 2d, at 929, as does §36(b)(2), 84 Stat. 1429 ("[A]pproval by the board of directors . . . shall be given such consideration by the court as is deemed appropriate under *all the circumstances*" (emphasis added)). And *Gartenberg* uses the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees.

2

*Gartenberg*'s approach also reflects §36(b)'s place in the statutory scheme and, in particular, its relationship to the other protections that the Act affords investors.

Under the Act, scrutiny of investment adviser compensation by a fully informed mutual fund board is the "cornerstone of the . . . effort to control conflicts of interest within mutual funds." *Burks*, 441 U. S., at 482. The Act interposes disinterested directors as "independent watchdogs" of the relationship between a mutual fund and its

adviser. *Id.,* at 484 (internal quotation marks omitted). To provide these directors with the information needed to judge whether an adviser's compensation is excessive, the Act requires advisers to furnish all information "reasonably . . . necessary to evaluate the terms" of the adviser's contract, 15 U. S. C. §80a–15(c), and gives the SEC the authority to enforce that requirement. See §80a–41. Board scrutiny of adviser compensation and shareholder suits under §36(b), 84 Stat. 1429, are mutually reinforcing but independent mechanisms for controlling conflicts. See *Daily Income Fund*, 464 U. S., at 541 (Congress intended for §36(b) suits and directorial approval of adviser contracts to act as "independent checks on excessive fees"); *Kamen*, 500 U. S., at 108 ("Congress added §36(b) to the [Act] in 1970 because it concluded that the shareholders should not have to rely solely on the fund's directors to assure reasonable adviser fees, notwithstanding the increased disinterestedness of the board" (internal quotation marks omitted)).

In recognition of the role of the disinterested directors, the Act instructs courts to give board approval of an adviser's compensation "such consideration . . . as is deemed appropriate under all the circumstances." §80a–35(b)(2). Cf. *Burks,* 441 U. S., at 485 ("[I]t would have been paradoxical for Congress to have been willing to rely largely upon [boards of directors as] 'watchdogs' to protect shareholder interests and yet, where the 'watchdogs' have done precisely that, require that they be totally muzzled").

From this formulation, two inferences may be drawn. First, a measure of deference to a board's judgment may be appropriate in some instances. Second, the appropriate measure of deference varies depending on the circumstances.

*Gartenberg* heeds these precepts. *Gartenberg* advises that "the expertise of the independent trustees of a fund, whether they are fully informed about all facts bearing on

the [investment adviser's] service and fee, and the extent of care and conscientiousness with which they perform their duties are important factors to be considered in deciding whether they and the [investment adviser] are guilty of a breach of fiduciary duty in violation of §36(b)." 694 F. 2d, at 930.

### III

While both parties in this case endorse the basic *Gartenberg* approach, they disagree on several important questions that warrant discussion.

The first concerns comparisons between the fees that an adviser charges a captive mutual fund and the fees that it charges its independent clients. As noted, the *Gartenberg* court rejected a comparison between the fees that the adviser in that case charged a money market fund and the fees that it charged a pension fund. 694 F. 2d, at 930, n. 3 (noting the "[t]he nature and extent of the services required by each type of fund differ sharply"). Petitioners contend that such a comparison is appropriate, Brief for Petitioners 30–31, but respondent disagrees. Brief for Respondent 38–44. Since the Act requires consideration of all relevant factors, 15 U. S. C. §80a–35(b)(2); see also §80a–15(c), we do not think that there can be any categorical rule regarding the comparisons of the fees charged different types of clients. See *Daily Income Fund, supra*, at 537 (discussing concern with investment advisers' practice of charging higher fees to mutual funds than to their other clients). Instead, courts may give such comparisons the weight that they merit in light of the similarities and differences between the services that the clients in question require, but courts must be wary of inapt comparisons. As the panel below noted, there may be significant differences between the services provided by an investment adviser to a mutual fund and those it provides to a pension fund which are attributable to the

greater frequency of shareholder redemptions in a mutual fund, the higher turnover of mutual fund assets, the more burdensome regulatory and legal obligations, and higher marketing costs. 527 F. 3d, at 634 ("Different clients call for different commitments of time"). If the services rendered are sufficiently different that a comparison is not probative, then courts must reject such a comparison. Even if the services provided and fees charged to an independent fund are relevant, courts should be mindful that the Act does not necessarily ensure fee parity between mutual funds and institutional clients contrary to petitioners' contentions. See *id.,* at 631. ("Plaintiffs maintain that a fiduciary may charge its controlled clients no more than its independent clients").[8]

By the same token, courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers. These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length. See 537 F. 3d, at 731–732 (opinion dissenting from denial of rehearing en banc); *Gartenberg, supra,* at 929 ("Competition between money market funds for shareholder business does not

——————

[8] Comparisons with fees charged to institutional clients, therefore, will not "doo[m] [a]ny [f]und to [t]rial." Brief for Respondent 49; see also *Strougo* v. *BEA Assocs.,* 188 F. Supp. 2d 373, 384 (SDNY 2002) (suggesting that fee comparisons, where permitted, might produce a triable issue). First, plaintiffs bear the burden in showing that fees are beyond the range of arm's-length bargaining. §80a–35(b)(1). Second, a showing of relevance requires courts to assess any disparity in fees in light of the different markets for advisory services. Only where plaintiffs have shown a large disparity in fees that cannot be explained by the different services in addition to other evidence that the fee is outside the arm's-length range will trial be appropriate. Cf. App. to Pet. for Cert. 30a; see also *In re AllianceBernstein Mut. Fund Excessive Fee Litigation,* No. 04 Civ. 4885 (SWK), 2006 WL 1520222, *2 (SDNY, May 31, 2006) (citing report finding that fee differential resulted from different services and different liabilities assumed).

support an inference that competition must therefore also exist between [investment advisers] for fund business. The former may be vigorous even though the latter is virtually non-existent").

Finally, a court's evaluation of an investment adviser's fiduciary duty must take into account both procedure and substance. See 15 U. S. C. §80a–35(b)(2) (requiring deference to board's consideration "as is deemed appropriate under all the circumstances"); cf. *Daily Income Fund*, 464 U. S., at 541 ("Congress intended security holder and SEC actions under §36(b), on the one hand, and directorial approval of adviser contracts, on the other, to act as independent checks on excessive fees"). Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process. See *Burks,* 441 U. S., at 484 (unaffiliated directors serve as "independent watchdogs"). Thus, if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently. Cf. *id.,* at 485. This is not to deny that a fee may be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg, supra*, at 928.

In contrast, where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome. When an investment adviser fails to disclose material information to the board, greater scrutiny is justified because the withheld information might have hampered the board's ability to function as "an independent check upon the

management." *Burks*, *supra*, at 484 (internal quotation marks omitted). "Section 36(b) is sharply focused on the question of whether the fees themselves were excessive." *Migdal* v. *Rowe Price-Fleming Int'l, Inc.,* 248 F. 3d 321, 328 (CA4 2001); see also 15 U. S. C. §80a–35(b) (imposing a "fiduciary duty with respect to the *receipt of compensation* for services*, or of payments of a material natur*e" (emphasis added)). But an adviser's compliance or non-compliance with its disclosure obligations is a factor that must be considered in calibrating the degree of deference that is due a board's decision to approve an adviser's fees.

It is also important to note that the standard for fiduciary breach under §36(b) does not call for judicial second-guessing of informed board decisions. See *Daily Income Fund*, *supra*, at 538; see also *Burks*, 441 U. S., at 483 ("Congress consciously chose to address the conflict-of-interest problem through the Act's independent-directors section, rather than through more drastic remedies"). "[P]otential conflicts [of interests] may justify some restraints upon the unfettered discretion of even disinterested mutual fund directors, particularly in their transactions with the investment adviser," but they do not suggest that a court may supplant the judgment of disinterested directors apprised of all relevant information, without additional evidence that the fee exceeds the arm's-length range. *Id.*, at 481. In reviewing compensation under §36(b), the Act does not require courts to engage in a precise calculation of fees representative of arm's-length bargaining. See 527 F. 3d, at 633 ("Judicial price-setting does not accompany fiduciary duties"). As recounted above, Congress rejected a "reasonableness" requirement that was criticized as charging the courts with rate-setting responsibilities. See *Daily Income Fund, supra*, at 538–540. Congress' approach recognizes that courts are not well suited to make such precise calculations. Cf. *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 308 (1997) ("[T]he

Court is institutionally unsuited to gather the facts upon which economic predictions can be made, and professionally untrained to make them"); *Verizon Communications Inc.* v. *FCC*, 535 U. S. 467, 539 (2002); see also *Concord* v. *Boston Edison Co.*, 915 F. 2d 17, 25 (CA1 1990) (opinion for the court by Breyer, C. J.) ("[H]ow is a judge or jury to determine a 'fair price'?"). *Gartenberg*'s "so disproportionately large" standard, 694 F. 2d, at 928, reflects this congressional choice to "rely largely upon [independent director] 'watchdogs' to protect shareholders interests." *Burks, supra,* at 485.

By focusing almost entirely on the element of disclosure, the Seventh Circuit panel erred. See 527 F. 3d, at 632 (An investment adviser "must make full disclosure and play no tricks but is not subject to a cap on compensation"). The *Gartenberg* standard, which the panel rejected, may lack sharp analytical clarity, but we believe that it accurately reflects the compromise that is embodied in §36(b), and it has provided a workable standard for nearly three decades. The debate between the Seventh Circuit panel and the dissent from the denial of rehearing regarding today's mutual fund market is a matter for Congress, not the courts.

## IV

For the foregoing reasons, the judgment of the Court of Appeals is vacated, and the case remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–586

_____

JERRY N. JONES, ET AL., PETITIONERS *v.* HARRIS
ASSOCIATES L. P.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[March 30, 2010]

JUSTICE THOMAS, concurring.

The Court rightly affirms the careful approach to §36(b) cases, see 15 U. S. C. §80a–35(b), that courts have applied since (and in certain respects in spite of) *Gartenberg* v. *Merrill Lynch Asset Management, Inc.*, 694 F. 2d 923, 928–930 (CA2 1982). I write separately because I would not shortchange the Court's effort by describing it as affirmation of the "*Gartenberg* standard." *Ante*, at 7, 17.

The District Court and Court of Appeals in *Gartenberg* created that standard, which emphasizes fee "fairness" and proportionality, 694 F. 2d, at 929, in a manner that could be read to permit the equivalent of the judicial rate regulation the *Gartenberg* opinions disclaim, based on the Investment Company Act of 1940's "tortuous" legislative history and a handful of extrastatutory policy and market considerations, *id.*, at 928; see also *id.*, at 926–927, 929–931; *Gartenberg* v. *Merrill Lynch Asset Management, Inc.*, 528 F. Supp. 1038, 1046–1050, 1055–1057 (SDNY 1981). Although virtually all subsequent §36(b) cases cite *Gartenberg*, most courts have correctly declined its invitation to stray beyond statutory bounds. Instead, they have followed an approach (principally in deciding which cases may proceed past summary judgment) that defers to the informed conclusions of disinterested boards and holds plaintiffs to their heavy burden of proof in the manner the

Act, and now the Court's opinion, requires. See, *e.g.*, *ante*, at 11 (underscoring that the Act "modifies" the governing fiduciary duty standard "in a significant way: It shifts the burden of proof from the fiduciary to the party claiming breach, 15 U. S. C. §80a–35(b)(1), to show that the fee is outside the range that arm's-length bargaining would produce"); *ante*, at 16 (citing the "degree of deference that is due a board's decision to approve an adviser's fees" and admonishing that "the standard for fiduciary breach under §36(b) does not call for judicial second-guessing of informed board decisions").

I concur in the Court's decision to affirm this approach based upon the Investment Company Act's text and our longstanding fiduciary duty precedents. But I would not say that in doing so we endorse the "*Gartenberg* standard." Whatever else might be said about today's decision, it does not countenance the free-ranging judicial "fairness" review of fees that *Gartenberg* could be read to authorize, see 694 F. 2d, at 929–930, and that virtually all courts deciding §36(b) cases since *Gartenberg* (including the Court of Appeals in this case) have wisely eschewed in the post *Gartenberg* precedents we approve.