Gloria STEINBERG; Michael Gaines; Sharon Gaines; Roger Bailey; Joseph Cordani; Barbara Cordani; Michael Lipstein; James E. Schultz; Rhonda Vladimir; Robert K. Finnell; Sherry Chait; Gerald Chait; Mei Hung; Jason Hung; Robin Resnick; Doreen Duke; Lauri C. Bader; Sylvia Volin; George Tsetsekos; Lawrence A. Stigas; Jean Stigas; Erik P. Gagnon; Mark J. Keane; Reiko Gagnon; Katharine Clark, Plaintiffs—Appellants,

v.

JANUS CAPITAL MANAGEMENT, LLC; Janus Capital Group, Incorporated; Janus Investment Fund, Nominal Defendant; Janus Aspen Series, Nominal Defendant; Janus Adviser Series, Nominal Defendant; Janus Distributors, LLC, Defendants—Appellees,

and

Canary Capital Partners, LLC; Canary Investment Management, LLC; Canary Capital Partners, LLC; Edward J. Stern; Banc Of America Securities, LLC; Bank of America Corporation; Cibc World Markets; Cibc Securities, Incorporated; Wall Street Global,

LLC; Trautman Wasserman & Company, Incorporated; Smith Barney Citigroup; Pritchard Capital Partners, LLC; Golden Gate Financial Group, LLC; Aurum Securities Corporation; Aurum Capital Management Corporation; Perkins Wolf McDonnell & Company; Bay Island Financial, LLP; Enhanced Investment Technologies, LLC, Defendants.

No. 10–1207.

United States Court of Appeals,
Fourth Circuit.

Argued: Sept. 20, 2011.

Decided: Dec. 2, 2011.

**ARGUED:** Timothy N. Mathews, Chimicles & Tikellis, LLP, Haverford, Pennsylvania, for Appellants. Mark Andrew Perry, Gibson, Dunn & Crutcher, LLP, Washington, D.C., for Appellees. **ON BRIEF:** Nicholas E. Chimicles, Denise Davis Schwartzman, Chimicles & Tikellis, LLP, Haverford, Pennsylvania, for Appellants. Jill M. Pfenning, Gibson, Dunn & Crutcher, LLP, Washington, D.C., for Appellees.

Before SHEDD and WYNN, Circuit Judges, and DAMON J. KEITH, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

**PER CURIAM:**

This case concerns mutual funds, their administration, and improper practices by the companies hired to manage them. Plaintiff–Appellants ("Plaintiffs") are individuals who held shares in about one-third of the mutual funds managed by Janus Capital Management LLC ("JCM"). Pursuant to Sections 36(b) and 47(b) of the Investment Company Act of 1940 ("ICA"), Plaintiffs brought derivative claims against JCM, Janus Capital Group Inc. (of which JCM is a subsidiary), and Janus Distributors LLC (which distributes shares of the funds that JCM advises), as well as three trusts, Janus Investment Fund, Janus Adviser Series, and Janus Aspen Series (collectively "Defendants"). The district court granted Defendants' motion for summary judgment regarding Plaintiffs' claims brought under Section 36(b), and dismissed Plaintiffs' claims brought under Section 47(b). Plaintiffs appealed the grant of summary judgment. This Court must therefore determine: (i) whether Defendants are entitled to claim offset damages; (ii) whether Plaintiffs can recover "flight damages"; (iii) whether Plaintiffs are entitled to rescission; and (iv) whether Plaintiffs have standing to sue on behalf of mutual funds in which they owned no shares. For the reasons discussed below, we **AFFIRM** the district court's grant of summary judgment in Defendants' favor.

I.

A mutual fund is a pooled investment vehicle that collects money from many investors and invests it in securities such as stocks, bonds, and short-term money market instruments. Each mutual fund share represents an investor's proportionate ownership of the fund's portfolio assets and the income (or losses) generated by those assets, net of fees and expenses.

Mutual funds are subject to regulation under the ICA.

During the relevant time period, the Janus family of mutual funds (the "Janus Funds") comprised about sixty separate funds organized under the three business trusts Plaintiffs sued. Each trust includes a series of mutual funds. The mutual funds are managed by investment advisors who enter into annual advisory contracts with the funds. JCM is an investment adviser to the Janus Funds. It provides investment management services to each of the funds, and in exchange, the funds pay JCM a management fee.

In September 2003, the New York Attorney General's Office announced that it was filing a complaint against a hedge fund for "market timing" in certain mutual funds, including the Janus Funds. The Securities and Exchange Commission ("SEC") also launched an investigation. Market timing refers to a strategy of frequent trading at off-peak times, and is designed to exploit inefficiencies in the way that mutual funds are priced under federal law. Because American mutual funds are priced once each day following the close of financial markets at 4:00 p.m. in New York, purchase orders for mutual fund shares placed after 4:00 p.m. are priced on the following day's value. Thus, in a classic example of market timing, where a U.S. mutual fund invests in Japanese securities, the opportunity arises to game the valuation system: Because the Japanese stock market closes at 2:00 a.m. Eastern time, the valuations occurring at 4:00 p.m. are based on market information that is fourteen hours old. If world markets rise during the interim period, a trader knows that the Japanese securities will increase as soon as the Japanese market opens. Thus, the trader can purchase a U.S. mutual fund invested in Japanese securities which has a stale price, knowing that a profit will accrue when Japanese markets open. Because mutual fund managers cannot instantaneously invest the trader's money in the Japanese security at the stale price, the manager is holding the trader's uninvested money while the trader receives a cut of the mutual fund's profit on the Japanese security. This results in a dilution of the mutual fund's assets.

Many mutual funds expressly forbid market timing—including the Janus Funds, whose prospectuses made clear that market timing was prohibited. The investigations revealed that, despite the apparent prohibition on market timing, JCM employees had entered into discretionary market timing agreements that involved several of the Janus Funds between November 2001 and September 2003.

Ultimately, JCM entered into a settlement with the SEC, the terms of which are stated in an Order Instituting Administrative and Cease–and–Desist Proceedings ("the Order"). Pursuant to the Order, JCM agreed to pay $100 million into a "Fair Fund" to be distributed to investors, comprising $50 million in disgorgement and a $50 million civil penalty. The Order provides that the $50 million in disgorgement can be used to offset monetary recoveries in private actions against JCM related to the market timing: "To preserve the deterrent effect of the civil penalties, JCM agrees that it shall not, after offset or reduction in any Related Investor Action for the amount of the disgorgement paid by it, further benefit by offset or reduction of any part of the civil penalties paid by it." (A "Related Investor Action" is defined as a private damages action brought against JCM by or on behalf of one or more investors based on substantially the same facts as those set forth in the Order.)

The SEC settlement also provided for an Independent Distribution Consultant

("IDC") to distribute the Fair Fund's $100 million. Investors were to receive, in order of priority, a proportionate share of losses suffered by the funds due to market timing and a proportionate share of advisory fees paid by funds that suffered such losses. The IDC determined that aggregate losses borne by the seven affected Janus Funds amounted to $21 million, and, thus, that amount went to individual accounts. The remainder was made available to compensate investors for other harms, if any. Subsequent to that compensation, all leftover funds were placed in an "Undistributed Funds Account" and given directly to the seven affected Janus Funds in proportion to their losses. As of June 19, 2009, after the last disbursements were sent to investors, undistributed funds totaled $19,257,589, which were credited to the affected funds. The IDC further determined that JCM earned $819,541 in fees on assets invested by market timers in the relevant time period.

In reaction to the state and federal regulatory actions, numerous civil lawsuits were filed based on allegations of market timing. Most of them, including Plaintiffs', were coordinated as part of a multi-district litigation in the District of Maryland. Plaintiffs are individual shareholders in the Janus Funds who asserted derivative claims. They allege that Defendants violated Section 36(b) of the ICA by failing to disclose the market timing agreements to the Janus Fund trustees in the course of negotiating annual advisory contracts with the Janus Funds.

Relevant to this appeal, the district court ultimately found that Plaintiffs: (i) could not recover damages under Section 36(b), including "flight damages"; and (ii) lacked standing to sue on behalf of mutual funds in which they owned no shares. Accordingly, it granted Defendants' motion for summary judgment. Plaintiffs appealed.

## II.

We review a district court's grant of summary judgment de novo. *Nielsen v. Gaertner*, 96 F.3d 110, 112 (4th Cir.1996).

## III.

On appeal, Plaintiffs contend: (i) that the district court erred in finding that Defendants could offset their liability for damages under Section 36(b) by amounts paid pursuant to the Order; (ii) that the district court erred in its determination of what constituted available damages, specifically its rejection of Plaintiff's request for "flight damages"; (iii) that the district court erred in its finding that the remedy of rescission was unavailable; and (iv) that the district court erred in its finding that Plaintiffs lacked standing to sue on behalf of certain mutual funds under Section 36(b). We address these arguments in turn.

### A. Remedies

■ We need not determine whether Plaintiffs can prove a Section 36(b) violation, but only whether any remedy exists for such a violation given Defendants' settlement with the SEC. Because we find that no remedy exists, we affirm the district court's grant of summary judgment.

Section 36(b) imposes upon investment advisors a fiduciary duty "with respect to the receipt of compensation for services." 15 U.S.C. § 80a–35(b). It provides a private cause of action by which plaintiffs can sue for breach of that duty. *Id.* If the suit is successful, Section 36(b) permits plaintiffs to recover "actual damages resulting from [the breach] ... [not to] exceed the amount of compensation or payments received ... by the investor." *Id.*

Thus, as we have previously observed, the statute is focused on fees. *See Migdal v. Rowe Price–Fleming Int'l, Inc.,* 248 F.3d 321, 328 (4th Cir.2001) ("As the statutory text indicates, Section 36(b) is sharply focused on the question of whether the fees themselves were excessive"). *See also Jones v. Harris Assocs. L.P.,* —— U.S. ——, ——, 130 S.Ct. 1418, 1426, 176 L.Ed.2d 265 (2010).

Accordingly, Defendants may be liable for the "actual damages" caused by their alleged breach. Here, actual damages amount to the portion of the fees that the Janus Funds paid while, unbeknownst to Plaintiffs, the funds were subject to market timing. The IDC determined that JCM earned $819,541 in fees on assets invested by market timers in the relevant time period. The parties do not dispute that figure. We therefore conclude that, if successful at trial, Section 36(b) would entitle Plaintiffs to recover up to $819,541 in actual damages.

### 1. *Offsetting Damages*

█ The question remains, however, whether the Order's offset provision ultimately precludes recovery. We hold that it does.

The Order compels JCM to pay $50 million in disgorgement and $50 million in civil penalties. It further provides that Defendants' liability in any private damages action may be offset by the amount Defendants' paid in disgorgement. Because the Fair Fund has distributed roughly $19 million to the Janus Funds— i.e., the monies placed in the "Undistributed Funds Account" and ultimately given directly to the seven affected Janus Funds—Defendants are entitled to a $19 million offset *if* the $19 million came from disgorgement rather than civil penalties.

Plaintiffs argue that because the Order gave investors priority over the Janus Funds in accessing money from the Fair Fund, and the investors received $61 million prior to the $19 million being distributed to the seven affected Janus Funds, the $50 million was necessarily exhausted by the time the $19 million was distributed. We disagree. There is nothing in the Order mandating full distribution of the disgorgement before distribution of the civil penalty. And we are unaware of any case evincing such a rule. Finally, nothing in the record suggests that Plaintiffs' characterization of the disbursement is accurate. Indeed, Plaintiffs' argument ignores the fungible nature of moneys and, if adopted, would create an arbitrary line that we prefer not to draw.

Moreover, we note that allowing JCM to offset the approximately $19 million that has already gone to the affected Janus Funds in no way undermines the goals of the SEC settlement. To ensure that the $50 million civil penalty serves as a $50 million deterrent, the Order bans JCM from claiming an offset for any of the civil penalty; that is, it requires JCM to suffer a $50 million loss (the civil penalty) *in addition* to any other civil liability it may have. The Order allows JCM to claim up to $50 million in offsets from the disgorgement paid into the Fair Fund because, even if the full $50 million disgorgement is offset, JCM still pays the full $50 million civil penalty on top of any civil liability. Consequently, regardless of what moneys were distributed when, if Defendants are restricted to $50 million in offsets, they will still be required to pay $50 million *in addition* to any civil liability and the Order's civil penalty will still result in a full $50 million deterrent. Since Defendants have thus far only offset around $21 million, they may claim up to around $29 million more in offsets without undermining the deterrence goals of the Order.

Thus, because the $19 million paid to the affected Janus Funds falls well below $29 million, Defendants may properly offset it. And because the $19 million offset to which the defendants are entitled exceeds the $819,541 that Plaintiffs could potentially recover under Section 36(b), the Janus Funds have been fully compensated. Plaintiffs would be unable to recover additional damages from Defendants under Section 36(b), and summary judgment is therefore appropriate.

### 2. *Flight Damages*

■ Plaintiffs contend that they are entitled to flight damages amounting to approximately $28.7 million. Flight damages, however, are not "damages" in the context of Section 36(b). This is because flight damages are transactional and administrative expenses that accrued when, upon learning of the state and federal actions against Defendants, investors redeemed their shares. Section 36(b), however, is focused on actual damages resulting from the breach of the fiduciary's duty to the mutual funds regarding his or her fees. Phrased differently, Section 36(b) applies to the "receipt of compensation for services," not costs accruing from disclosure of the market timing investigations to investors. 15 U.S.C. § 80a–35(b). Defendants never "received" flight damages, let alone as compensation from Plaintiffs; rather, the mutual funds paid the flight damages to other persons and entities. It is true that Defendants failed to disclose the discretionary frequent trading arrangements to the Trustees; however, the only *fees* resulting from this nondisclosure were the advisory fees that Defendants earned on the affected funds, not the administra-

tive costs associated with investor flight. Thus, Section 36(b) provides Plaintiffs with neither a cause of action nor a remedy regarding flight damages.

### 3. *Rescission*

■ Plaintiffs argue that they are entitled to rescission under the ICA. They assert that because Section 36(b) allows for "other relief," and because Section 47(b) includes the remedy of rescission, the two work in tandem to allow parties aggrieved under Section 36(b) to rescind. We find this argument unpersuasive.

We cannot conclude that Sections 36(b) and 47(b) interact as Plaintiffs assert. As we have explained, Section 36(b) provides a limited private cause of action focused on an advisor's fiduciary duty related to compensation. It is true that the provision mentions "other relief," stating that "no damages *or other relief* shall be granted against any person other than the recipient of such compensation or payments." * 15 U.S.C. § 80a–35(b) (emphasis added). We do not read this, however, to mean that Section 36(b) encompasses any relief that plaintiffs might want or a court might be tempted to award. Rather, this language is a prohibition against awarding remedies against anyone other than the recipient of the compensation.

Section 47(b), in turn, provides that a contract "that is made, or whose performance involves, a violation of this subchapter ... is unenforceable by either party." 15 U.S.C. 80a–46(b)(1). Crucially, however, there is no private cause of action to enforce Section 47(b). Thus, Plaintiffs are forced to argue that the rescission remedy in Section 47(b)—a provision which in-

---

* In full, the sentence reads: "No such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such compensation or payments."

cludes no express private cause of action—can be wedged into the phrase "other relief" in Section 36(b), even though that section expressly provides a limited damages remedy. Tellingly, Plaintiffs cite no cases in which rescission has been allowed pursuant to Section 36(b). We therefore find that Plaintiffs are not entitled to rescission under Section 36(b).

### B. Standing

The final issue before this Court is standing.

Each of Defendants' trusts includes a subset of individual mutual funds. Thus, it is possible for investors to own stock in some but not all of the funds associated with a particular trust. Such is the case here, where Plaintiffs sued on behalf of all mutual funds in the relevant trusts even though they owned shares in only a portion of those funds. The district court held that Plaintiffs could sue only on behalf of the mutual funds in which they owned shares. Thus, regarding those funds in which they claimed no ownership, they had no standing, and pursuant to Federal Rule of Civil Procedure 12(b)(6), dismissal, in part, was warranted. Plaintiffs appeal this ruling.

Standing is part and parcel of this Court's jurisdiction. To establish standing, Plaintiffs "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Section 36(b) authorizes suit by "a security holder of [a] registered investment company on behalf of such company, against [an] investment advisor" for breach of fiduciary duty. Plaintiffs argue that, because they invested in each of Defendants' three trusts (by way of owning shares in *some* of each trust's mutual funds), they have standing to bring claims on behalf of all three trusts despite not owning shares in *all* of the mutual funds. Defendants counter that, because Plaintiffs did not own shares in a number of the mutual funds, they cannot claim that they were injured by alleged harm to those funds caused by Defendants' failure to disclose market timing. In light of the foregoing discussion, however, we need not reach the merits of the parties arguments and decline to do so. As explained, even if Plaintiffs have standing to sue on behalf of the funds in which they did not own shares, Defendants' right to offset precludes Plaintiffs' recovery.

### IV.

For the foregoing reasons, we conclude that the district court did not err in granting summary judgment for Defendants. The judgment of the district court is

*AFFIRMED.*