75 A.3d 298

# MARYLAND INSURANCE COMMISSIONER

v.

## Leon KAPLAN.

No. 12, Sept. Term, 2012.

Court of Appeals of Maryland.

Aug. 16, 2013.

Reconsideration Denied Oct. 18, 2013.

J. Van Lear Dorsey, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for appellant/cross-appellee.

Ward B. Coe, II (Mark S. Saudek of Gallagher, Evelius & Jones, LLP, Baltimore, MD), on brief, for appellee/cross-appellant.

Submitted before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD and BELL *, JJ.

McDONALD, J.

CareFirst has a unique public and charitable mission under State law to ensure affordable and adequate health care for

---

\* Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Maryland residents. In light of that mission it enjoys a variety of tax and other benefits under the law. State law confers broad authority on the Maryland Insurance Commissioner ("Commissioner") to oversee its operation and its adherence to its mission.

As this Court noted in 1994, because CareFirst has no shareholders, the Commissioner has an enhanced role in preventing abuses and misuse of corporate funds. One concern is the payment of excessive executive compensation from corporate assets that would otherwise be devoted to its public and charitable purposes. In 2003, while reforming the governance and oversight of Carefirst, the Legislature entrusted the Commissioner with ensuring that executive compensation at CareFirst is "fair and reasonable" and "for work actually performed for the benefit of the corporation."

This case arises from the termination of Leon Kaplan, a former executive of CareFirst. At that time, CareFirst declined to pay part of the post-termination compensation set forth in Mr. Kaplan's employment contract on the basis that it was not "for work actually performed," as that standard had been interpreted by the Commissioner. In a subsequent administrative proceeding, the Commissioner affirmed the decision not to pay those benefits on the ground that the payments would violate the statute. We are asked to decide whether the Commissioner's determination is preempted in part by the federal Employee Retirement Income Security Act of 1974 ("ERISA") and, if not, whether the Commissioner has mis-applied the Maryland statute.

For the reasons outlined below, we hold that the Commissioner's determination is not preempted by ERISA, that the Commissioner's construction of the insurance code is legally correct, and that there was substantial evidence to support the Commissioner's determination in this case.

### Background

*CareFirst*

Carefirst, Inc. ("CareFirst"), a nonstock, nonprofit Maryland corporation, is a holding company with two subsidiaries

that provide health insurance for millions of Maryland residents. Each entity is licensed as a nonprofit health service plan under Maryland Code, Insurance Article ("IN"), § 14–101 *et seq.* Such entities are designated as "public benefit corporations" exempt from taxation. IN § 14–102(b). The statutory mission of a nonprofit health service plan is to "provide affordable and accessible health insurance," to "assist and support public and private health care initiatives" for uninsured individuals, and to "promote the integration of a health care system that meets the health care needs of all the residents" of the areas in which it operates. IN § 14–102(c).

Because it has no shareholders and because it has an important public mission, CareFirst has long been subject to special regulation by the State. In particular, the law provides for close oversight by the Commissioner to ensure that its officers and directors carry out their fiduciary duties and that its assets are devoted to the statutory mission. In *O'Donnell v. Sardegna,* 336 Md. 18, 646 A.2d 398 (1994), this Court held that CareFirst subscribers could not bring a "derivative action" against former officers of CareFirst for dissipating the company's assets for the executives' own benefit. Rather, the Court held, Maryland law relies on oversight by State authorities, including the Commissioner, to prevent the waste of corporate assets of CareFirst through the payment of "excessive perquisites, salaries, and bonuses" to those who have charge of the company. 336 Md. at 37–44, 646 A.2d 398.

*Regulation of Executive Compensation at CareFirst*

*Conversion statute—anti-inurement and anti-bonus provisions*

Following the *Sardegna* decision, the General Assembly enacted a statute governing the acquisition and conversion of nonprofit health care entities such as CareFirst into for-profit entities. Chapters 123, 124, Laws of Maryland 1998, *codified at* Maryland Code, State Government Article ("SG"), § 6.5–101 *et seq.* Under that law, conversion of a nonprofit health

service plan like CareFirst into a for-profit company, or its sale or merger, requires the approval of the Commissioner.

A key concern of that legislation is to ensure that the "public or charitable assets" of such an entity are not redirected to the private benefit of its managers or others. Any such transaction is to be scrutinized to, among other things, "ensure that no part of the public or charitable assets . . . inure directly or indirectly to an officer, director, or trustee" of the organization. SG § 6.5–301(b)(4). In addition, steps must be taken to ensure that "no officer, director, or trustee of the [organization] receives any immediate or future remuneration as the result of an acquisition . . . except in the form of compensation paid for continued employment. . . ." SG § 6.5–301(b)(5). These restrictions are sometimes referred to as the "anti-inurement" and "anti-bonus" provisions of the law governing acquisitions of nonprofit health care entities.[1]

*Anti-inurement and anti-bonus provisions applied to proposed Carefirst transaction*

In 2002, the management of CareFirst sought approval from the Commissioner[2] for a proposed conversion of CareFirst to for-profit status and the sale of the company to a private health insurer, Wellpoint Health Networks, Inc., for approximately $1.37 billion. As part of the deal, CareFirst executives were slated to receive $119.6 million in merger incentives and severance pay, including $39.4 million in retention bonuses, severance, and tax benefits for CareFirst's then-CEO William L. Jews. When word of the proposed deal broke, there was considerable outcry among both the public and State legislators.[3]

---

**1.** At the time of the proposed Wellpoint transaction described in the text, these two provisions were codified at SG § 6.5–301(b)(3)–(4).

**2.** During the time period pertinent to this case, several different individuals occupied the position of Maryland Insurance Commissioner. All, of course, exercised the same powers subject to the same limitations.

**3.** *See, e.g.*, M.W. Salganik, *CareFirst bonuses defended as "fair . . . compensation"*, Baltimore Sun (December 13, 2002) available at

The Commissioner reviewed the application and, after conducting 15 days of hearings, issued a report and an order in March 2003 concluding that the proposed conversion and acquisition was not "in the public interest" and that it was being driven by the anticipated payments of multi-million dollar bonuses to CareFirst executives. Accordingly, the Commissioner concluded that the proposed transaction violated Maryland law in a number of respects, including the anti-inurement and anti-bonus provisions. Stating that "the critical inquiry is whether any sums that an officer or director receives constitute reasonable or fair compensation for work actually performed," the Commissioner concluded that the proposed payments to CareFirst executives would violate both provisions.

*Commissioner's construction of conversion statute incorporated in IN § 14–139*

In response to the Commissioner's report, the General Assembly enacted extensive legislation during its 2003 and 2004 sessions to reform CareFirst and refocus its management on its nonprofit mission. Chapters 356, 357, Laws of Maryland 2003; Chapters 257, 330, Laws of Maryland 2004.[4] Among the reforms were additional measures to govern executive compensation at nonprofit health service plans. That legislation incorporated into IN § 14–139(c) the general standard that the Commissioner had developed in applying the anti-inurement and anti-bonus provisions of the conversion statute in the Wellpoint transaction:

> A director, trustee, officer, executive, or employee of a [nonprofit health service plan] may only approve or *receive from the assets of the corporation fair and reasonable compensation in the form of salary, bonuses, or perquisites*

<http://articles.baltimoresun.com/2002–12–13/business/0212130348_1_CareFirst-bonuses-jews>.

**4.** Part of the 2004 legislation codified provisions of a settlement agreement and consent order that resolved litigation concerning the 2003 legislation.

*for work actually performed for the benefit of the corpora-tion.*

IN § 14–139(c) (emphasis added). The anti-inurement and anti-bonus standards were thus effectively extended to executive compensation outside of the context of an acquisition or for-profit conversion of a nonprofit health service plan.[5]

To ensure that only "fair and reasonable" compensation is paid "for work actually performed," the statute requires that the board of directors approve and adhere to compensation guidelines for board members and officers. IN § 14–139(d). Those guidelines are to be developed by comparison with similar nonprofit health service plans—as opposed to private corporations. *Id.* On an annual basis, the Commissioner is to review the compensation actually paid and, if it exceeds the guidelines, prohibit the payment. *Id.*

*The William Jews case*

In November 2006, the board of directors of CareFirst terminated William L. Jews, who had served as its CEO since 1993. In accordance with the severance terms of Mr. Jews' employment contract, the board approved the payment to Mr. Jews of approximately $18 million in post-termination benefits comprised of various components of his compensation package.[6] Part of the amount approved consisted of a payment based on the terms of CareFirst's Supplemental Executive Retirement Plan ("SERP")—an unfunded executive pension

---

5. There is no question that the Legislature intended to adopt the standard articulated by the Commissioner in the Wellpoint conversion case. Apart from the similarity in language, the preamble to the bill referred explicitly to the Commissioner's report concerning excess executive compensation. Chapters 356 (Preamble), 357 (Preamble), Laws of Maryland 2003.

6. The components included continuation of base year salary for three years ($2,925,500), continuation of benefits for the same period ($191,-011), payment for unused leave ($61,875), deferred compensation under the long term incentive plan ($2,437,712), payments for outstanding grants under the long term incentive plan ($1,150,000), payments from the company's tax-qualified pension plan and 401(k) plan ($684,537), and a payment based on a supplemental executive retirement plan ($9,777,528).

plan that is also a subject of this case. Pursuant to IN § 2–205,[7] the Commissioner conducted an examination of Care-First to review the compensation and benefits to be paid to Mr. Jews following his termination.

The Commissioner examined the post-termination payments due Mr. Jews under his employment contract with CareFirst and determined that the amount violated the requirements that compensation be "fair and reasonable" and "for work actually performed for the benefit of the corporation." In reaching that conclusion, the Commissioner reasoned that these two requirements of IN § 14–139(c) imposed substantive obligations on the officers and directors of CareFirst that were independent of the procedural guidelines for setting compensation that are set forth in IN § 14–139(d). The Commissioner also concluded that whether proposed compensation satisfies the criteria of IN § 14–139(c)—*i.e.*, whether it is "fair and reasonable" and for "work actually performed"—is a question of fact to be determined on the circumstances of each case.

On July 14, 2008, the Commissioner ordered that Mr. Jews' total post-termination compensation be reduced by half—from approximately $18 million to approximately $9 million—although the order did not specify how the reduction was to be allocated across the various components of the compensation package.[8]

---

7. The statute authorizes the Commissioner to "conduct an analysis or examine the affairs, transactions, accounts, records, assets, and financial condition" of insurers and related organizations. IN § 2–205(b).

8. That order was appealed to the Circuit Court for Baltimore County. That court reversed the decision of the Commissioner in an opinion dated November 10, 2009, and the Commissioner appealed to the Court of Special Appeals. In an unreported opinion dated January 21, 2011, the Court of Special Appeals agreed with the Commissioner's interpretation of the statute, but affirmed the Circuit Court because it found that there was insufficient evidence to support the Commissioner's decision that Mr. Jews' post-termination payments should be reduced. Both the Circuit Court and the Court of Special Appeals faulted the Commissioner for addressing the post-termination compensation in the

*Revision of CareFirst executive compensation guidelines*

After the Commissioner's order was issued in the Jews case, the compensation committee of the CareFirst board revised CareFirst's executive compensation guidelines and, on September 28, 2008, approved a revision to be submitted to the board. The revised guidelines were adopted by the board in December 2008. These revised guidelines acknowledge that IN § 14–139 requires CareFirst to propose compensation guidelines consistent with that law. The guidelines included recognition of the obligation on the CareFirst Board to make "a separate independent judgment whether the compensation—even if otherwise comparable to similar health service plans—constitutes fair and reasonable compensation ... for work actually performed for the benefit of CareFirst."

*The Employment and Compensation of Mr. Kaplan*

*Mr. Kaplan's employment agreement*

Leon Kaplan had been retained by CareFirst to serve as an executive vice president in December 2000. In that capacity, Mr. Kaplan was primarily responsible for the insurance claims function and information technology.[9] At the time he was hired, he executed an employment agreement, which provided that it was to be interpreted in accordance with Maryland law. The terms of the agreement called for Mr. Kaplan's employment to run until December 3, 2003, at which time the

---

aggregate rather than analyzing the reasonableness of the individual components of that compensation.

9. As he did in his testimony at the administrative hearing, Mr. Kaplan devotes a significant portion of his brief to the details of his work for CareFirst in those capacities and extolls his performance of his job duties. Elsewhere, the record indicates that he was paid between $840,000 and $1,200,000 in each of the years that he provided those services. Of course, the question before us is not to review Mr. Kaplan's job performance or to determine whether he was overpaid or underpaid at the time he performed those services. Rather, it is to determine whether some of the *post-employment* benefits provided by his employment contract were fair and reasonable and for work actually performed for the benefit of CareFirst and whether that determination is precluded by federal law.

agreement would automatically renew each year until either Mr. Kaplan or CareFirst opted out. The original employment agreement was entered into prior to the rejection of the proposed Wellpoint transaction, the amendment of IN § 14–139, or the development of revised CareFirst executive compensation guidelines.[10]

Mr. Kaplan's employment agreement provided several forms of post-employment compensation in the event that his employment with CareFirst was terminated without cause:

(1) He was to continue to receive his base salary for two years after the date of termination.

(2) He was to receive payment of the full-year target amount under the annual incentive plan ("AIP"), also called the Management Incentive Plan, for the year in which he was terminated if the termination occurred after the first three months of the calendar year.

(3) He was to receive a long-term incentive plan payment on a prorated basis.

(4) He was to receive a payment from CareFirst's SERP, if he met certain age and years-of-service eligibility requirements.

(5) He was to continue to receive a variety of additional benefits and perquisites for one year.

Under a non-compete clause in the employment agreement, Mr. Kaplan was prohibited from working in the health insurance industry for two years following termination.

The elements of Mr. Kaplan's post-employment compensation that are at issue in this case are the payments with respect to the AIP and the SERP. Mr. Kaplan's employment agreement provided for him to receive enhanced benefits with

---

**10.** Mr. Kaplan's employment contract was renewed after the General Assembly incorporated the anti-inurement and anti-bonus standards in IN § 14–139 in 2003. In the administrative forum and Circuit Court he argued unsuccessfully that the 2003 legislation impaired his contract rights, but has not pursued that argument in this appeal.

respect to each of those plans that exceeded the amounts that might otherwise be due under both plans.

The AIP was designed to provide additional compensation to CareFirst executives and other management employees each year if CareFirst achieved certain minimal levels of financial and other performance for the particular year. The payout was to be determined at the end of the calendar year with payments made the following March. The "target award" for a person in Mr. Kaplan's position was to be 45% of base salary.[11] Under Mr. Kaplan's employment agreement, he was to receive a full-year payout of the target amount upon termination, even if he did not work the entire year and even if the minimal objectives were not achieved, so long as he was terminated after the first three months of that year.

A supplemental executive retirement plan, or SERP, provides a company's senior executives with retirement benefits in addition to those provided under a company's general pension plan.[12] The SERP for CareFirst executives had what is known as "cliff vesting"—*i.e.*, an employee must work a certain number of years in order to be eligible for benefits under the plan. Mr. Kaplan's employment agreement enhanced his potential benefits under the SERP by crediting him with time that he had not actually worked for CareFirst. Under the CareFirst SERP, an executive was ordinarily eligible for benefits if, upon retirement, the executive either (a) was at least 55 years old and had served 10 years of executive service or (b) was at least 62 years old and had served five

---

**11.** The actual award could vary from 0% to 150% of the target award, depending on CareFirst's financial performance.

**12.** A compensation expert who testified on behalf of Mr. Kaplan at the administrative hearing stated that federal regulations governing tax-qualified pension plans limit the disparity in payouts among retirees such that the pension benefit of a highly-compensated executive is a lower percentage of the executive's pre-retirement income than it is of the pre-retirement income of "a janitor, clerk, or any individual contributor in middle management." A SERP increases retirement benefits for highly paid executives to more closely match the percentage of their pre-retirement income.

years of executive service. As part of his employment agreement, Mr. Kaplan was credited with executive service from January 1, 1991, almost 10 years prior to his actual employment by CareFirst.[13]

*The Termination of Mr. Kaplan*

On April 30, 2008, Mr. Kaplan was terminated without cause by CareFirst. Under the terms of his contract, Mr. Kaplan was to receive approximately $6.7 million in post-termination monetary compensation.[14] The termination occurred during the pendency of the Commissioner's examination and hearing in the Jews case.

As indicated above, as a result of the Commissioner's order in the Jews case, the CareFirst board reviewed its compensation guidelines and revised them to ensure compliance with IN § 14–139(c) as construed by the Commissioner. It reviewed Mr. Kaplan's situation with its counsel and a compensation consultant, in light of those guidelines. At the time of his termination, Mr. Kaplan would not have been eligible for SERP benefits, absent the credit provided in his employment contract.[15] Similarly, he would not otherwise have been eligible for a full-year payout of the target amount under the

---

**13.** At the time Mr. Kaplan was initially employed by CareFirst, the SERP itself did not acknowledge the possibility that an executive might receive credit for time that the executive had not worked for CareFirst. Shortly before he was terminated, it was amended to allow for service credits conferred by the employment contracts of individual executives.

**14.** That amount consisted of continuation of his base salary for two years ($1,086,536), continuation of various benefits and perquisites ($27,649), payment for unused leave ($28,535), deferred compensation under the long term incentive plan ($724,660), payments for outstanding grants under the long term incentive plan ($319,305), payments from the company's tax qualified pension plan and 401(k) plan ($398,-381), payment of the full-year target amount for 2008 under the AIP ($271,634) and a payment based on the SERP ($3,714,261).

**15.** At the time of his termination, Mr. Kaplan was 57 years old and had worked for CareFirst for slightly less than seven and one-half years. Thus, he was not eligible under either formula in the plan (age 55 with 10 years of employment or age 62 with five years of employment) without the credit for time prior to his actual employment with CareFirst.

terms of the AIP, even if he had remained employed with CareFirst for the full year.[16]

*CareFirst Decision Not to Pay SERP and Full–Year AIP*

After consulting with legal counsel concerning the application of IN § 14–139(c), the CareFirst CEO recommended to the company's compensation committee that Carefirst not pay Mr. Kaplan the benefits under the SERP or a full-year target amount under the AIP, reasoning that those amounts were not for work actually performed. The compensation committee accepted that recommendation.

On January 29, 2009, CareFirst advised the Commissioner that it had determined that it should not pay Mr. Kaplan a benefit under the SERP and should pay only a pro rata amount under the AIP. As a result, it would pay Mr. Kaplan $2,695,912 [17] (plus $4,719 in unpaid salary due at the time of termination) instead of the $6.7 million claimed by Mr. Kaplan. It decided not to pay Mr. Kaplan $3,853,033 that he had sought with respect to the SERP and $181,089 representing the balance of the full year target amount with respect to the 2008 AIP.

*Administrative Review by the Commissioner*

On February 5, 2009, the Commissioner issued an initial order concluding that CareFirst's decision was consistent with IN § 14–139. The Commissioner further concluded that, if CareFirst were to pay Mr. Kaplan the amount he sought, it would violate IN § 14–139(c). Mr. Kaplan requested a hearing as to that initial determination, and the matter was delegated to the Deputy Commissioner for a final administrative decision.[18]

---

**16.** Because CareFirst did not meet the pre-established minimal financial performance threshold in 2008, an executive in a similar position to Mr. Kaplan who worked the entire year would not have received a payment under the AIP for that year.

**17.** Most of those benefits were paid in 2008 and 2009.

**18.** Shortly before the institution of state administrative proceedings, Mr. Kaplan had filed a suit in federal court alleging breach of contract

On September 14, 2009, following an evidentiary hearing in which CareFirst also participated, the Deputy Commissioner affirmed the prior order and concluded that CareFirst was precluded by IN § 14–139(c) from paying Mr. Kaplan the additional $4,034,122 in SERP and full year AIP payments. That is the ruling that we have been asked to review.[19]

In a memorandum explaining the final administrative order, the Deputy Commissioner rejected Mr. Kaplan's legal arguments that the application of IN § 14–139 to the SERP was preempted by ERISA and that its application to him violated the contract clauses of the federal and Maryland constitutions.[20] The Deputy Commissioner upheld the determination of the CareFirst board for two reasons.

First, the Deputy Commissioner agreed that the SERP and full-year AIP payments would violate IN § 14–139(c) because they were not "for work actually performed" for the benefit of CareFirst. She noted that the Legislature had established this standard in light of the distinction between nonprofit health service plans and private corporations. She concluded that post-termination payments must represent moneys owed to the departing employee (such as salary, commission, or deferred compensation) for work providing a benefit to Care-First and not simply benefit the departing employee. An incentive or inducement provided at the time of hiring that did not relate to any work by the employee does not meet that standard. In the Deputy Commissioner's view, the CareFirst board had correctly determined that the grant, at the outset of

and seeking recovery of ERISA plan benefits—*i.e.*, the SERP. The federal court abstained in light of the state administrative proceedings and dismissed the complaint. *Kaplan v. CareFirst, Inc.*, 614 F.Supp.2d 587 (D.Md.2009).

**19.** Because the matter was delegated to the Deputy Commissioner for a final administrative decision, we will also refer to it as the Commissioner's determination in this case.

**20.** The Deputy Commissioner also held that it was not necessary to have expert testimony to determine the fairness and reasonableness of Mr. Kaplan's compensation.

employment, of the service credit toward the SERP and the grant of a full-year AIP payout for a partial year's work were inducements for Mr. Kaplan that did not directly benefit CareFirst or compensate Mr. Kaplan for work already done. She reasoned that "Mr. Kaplan did not have to do anything to earn the service credit." Accordingly, she concluded that a grant of the service credit and a payment of a full-year AIP amount would violate IN § 14–139(c) because they were not for work actually performed.

Second, the Deputy Commissioner concluded that, even if the SERP payment and full-year AIP payout were "for work actually performed," the payments would violate IN § 14–139(c) because the amounts were not fair and reasonable. She noted that the provisions of Mr. Kaplan's employment contract that supported those payments contradicted the standards that otherwise governed the SERP and AIP. Without the special service credit provided in his employment contract, Mr. Kaplan did not satisfy either of the criteria for vesting in the SERP based on age and length of employment. Under the actual terms of the 2008 Management Incentive Plan, Mr. Kaplan would be entitled at best to a prorated AIP payment. The Deputy Commissioner reasoned that an employment contract that singled out the employee for such "preferential treatment" and "favoritism" was unjustified, particularly in the setting of a nonprofit health service plan. She observed that nothing in the record indicated that Mr. Kaplan had been awarded these benefits because his skills were rare or difficult to find. She further noted that his own expert stated that the market for such skills is broad and that Mr. Kaplan had earned approximately 47% more in 2007 in total direct compensation than the industry average for his position.

*Judicial Review in Circuit Court*

Mr. Kaplan appealed the final administrative order to the Circuit Court for Baltimore County. That court held that there was substantial evidence to support the Commissioner's determination that the payment to Mr. Kaplan of the enhanced SERP and full-year AIP benefits would not be for

work actually performed and therefore would violate IN § 14–139(c). However, the court also held that ERISA preempted the Commissioner's action with respect to the SERP. Accordingly, the Circuit Court upheld the Commissioner's decision as to the full-year AIP payment and reversed it as to the SERP.

The Commissioner appealed the Circuit Court's decision to the Court of Special Appeals. Mr. Kaplan filed a cross-appeal. Prior to a decision by the intermediate appellate court, we issued a writ of certiorari.

## Discussion

■ The final administrative order is subject to judicial review pursuant to IN § 2–215. In this context we directly evaluate the Commissioner's administrative determination, not the decision of the Circuit Court. *Mehrling v. Nationwide Ins. Co.*, 371 Md. 40, 57, 806 A.2d 662 (2002).

There is no dispute that the CareFirst SERP is regulated by ERISA.[21] Thus, the first question that we must resolve is whether the ERISA preemption provision precludes the application of State law to the proposed SERP payment. If not, we consider whether the final administrative order correctly interpreted and applied IN § 14–139(c) in approving Care-First's decision not to pay the SERP benefit. In conjunction with that question, we also consider the final administrative order's approval of CareFirst's decision to pay only a prorated AIP benefit.

*Standard of Review*

■ The interpretation of ERISA, and more particularly of the breadth of its preemption provision, is a legal question that is not within the special expertise of the Commissioner. Accordingly, we accord no special deference to the Commissioner's view of that issue.

■ Our review of the Commissioner's application of IN § 14–139(c) is otherwise. That statute is one of several

---

21. There also appears to be no dispute that the AIP is not regulated by ERISA.

provisions in the insurance code in which the General Assembly, as described by this Court in *Sardegna* and reinforced in subsequent legislation, has charged the Commissioner with special oversight of nonprofit health service plans. As outlined above, in IN § 14–139(c) itself, the General Assembly approved, incorporated, and extended the Commissioner's interpretation of anti-inurement and anti-bonus provisions of the conversion statute. Accordingly, the Commissioner's construction of IN § 14–139(c) is entitled to substantial deference. *See, e.g., Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 69, 729 A.2d 376 (1999).

■ Finally, assuming that we agree with the administrative construction of the statute, the application of the correct legal standard to the facts of a particular case must be supported by substantial evidence—that is, we assess "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Lumbermen's Mut. Cas. Co. v. Insurance Commissioner,* 302 Md. 248, 266, 487 A.2d 271 (1985) (quotation and citations omitted).

### *Whether the Commissioner's Application of IN § 14–139(c) is Preempted by ERISA*

#### *ERISA Preemption*

■ Under the Supremacy Clause of Article VI of the United States Constitution, a federal law preempts a state law when Congress chooses to supersede state law, expressly or by implication, or when there is a conflict between federal and state law. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). One example of express preemption appears in ERISA, which provides that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by the statute. 29 U.S.C. § 1144(a). There are a number of exceptions to this broadly

stated preemption, including laws relating to insurance and state criminal laws. 29 U.S.C. § 1144(b)(2), (4).

The Supreme Court has noted the difficulty in defining the scope of the seemingly simple language of the ERISA pre-emption provision. "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for really, universally, relations stop nowhere. . . . We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655–56, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (internal quotations and citations omitted). The Court has devised a two-part inquiry: "A law 'relate[s] to' a covered employee benefit plan for purposes of [§ 1144(a) ] if it [1] has a connection with or [2] reference to such a plan." *Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.*, 519 U.S. 316, 324, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). This test is of limited utility, as "connection with" is little more definite than "relates to." *See Travelers*, 514 U.S. at 656, 115 S.Ct. 1671.

█ As a practical way to determine whether a state law has the forbidden connection, courts look both to "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." *Travelers*, 514 U.S. at 658–59, 115 S.Ct. 1671. Consistent with that approach, the Supreme Court has referred to statements of ERISA's congressional sponsors who explained that the preemption provision was designed to preclude "conflicting and inconsistent State and local regulation." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9–11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (citing 120 Cong. Rec. 29197 & 29933 (1974)). The Court has summarized those statements as follows:

It is thus clear that ERISA's pre-emption provision was prompted by recognition that employers establishing and

maintaining employee benefit plans are faced with the task of coordinating complex administrative activities. A patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them. Pre-emption ensures that the administrative practices of a benefit plan will be governed by only a single set of regulations.

*Id.* at 11, 107 S.Ct. 2211. Therefore, "pre-emption does not occur ... if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability." *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 130 n. 1, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (internal quotation marks and citations omitted). "What triggers ERISA preemption is not just any indirect effect on administrative procedures but rather an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit." *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 258 (4th Cir.2005) (internal quotations and citations omitted).

In some circumstances, the Court is particularly wary about holding that a state law's connection to a benefit plan renders that law inoperative. When the state law under consideration is in an area of traditional state regulation, there is a presumption that "the historic police powers of the States were not to be superseded unless that was the clear and manifest purpose of Congress.... A reading of [29 U.S.C. § 1144(a) ] resulting in the pre-emption of traditionally state-regulated substantive law in those areas where ERISA has nothing to say would be unsettling." *Dillingham Constr., N.A.*, 519 U.S. at 325, 330, 117 S.Ct. 832.

*Examples of state laws that affect directly plan eligibility standards or administration*

A review of cases in which courts have struck down or limited the application of state statutes as preempted by

ERISA reveals a pattern: Those cases involve statutes that would require companies to structure their plans or administer them in a certain way, such that conflicting rules in different states could hinder an employer from administering effectively a national plan as envisioned in ERISA.[22]

For example, in *Egelhoff v. Egelhoff,* 532 U.S. 141, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001), the Supreme Court held that a state law that set eligibility requirements for beneficiaries of an employee benefit plan in the case of an employee's divorce had a connection with an ERISA plan and was therefore preempted. "The Washington statute at issue here [interferes with nationally uniform plan administration]. Plan administrators cannot make payments simply by identifying the beneficiary specified by the plan documents. Instead they must familiarize themselves with state statutes so that they can determine whether the named beneficiary's status has been 'revoked' by operation of law. And in this context the burden is exacerbated by the choice-of-law problems that may confront an administrator when the employer is located in one

---

**22.** Preemption has also been found where state laws directly target employee benefit plans. In *FMC Corp. v. Holliday,* 498 U.S. 52, 60, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990), the Court found preemption of a Pennsylvania law precluding employee welfare benefit plans from exercising subrogation rights on a claimant's tort recovery. Similarly, in *Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), the Court held that a state anti-garnishment statute that specifically protected employee benefit funds from garnishment except in certain circumstances was preempted.

Uncodified language in the session laws that enacted IN § 14–139(c) indicates that it was intended to apply to "a compensation agreement . . . including an agreement for termination, severance, performance bonuses, or *supplemental executive retirement benefits."* Chapter 356, § 8, Chapter 357, § 8, Laws of Maryland 2003 (emphasis added). While this uncodified language might be interpreted to "target" SERPs generally, it can also be interpreted to refer to an individual employment agreement, such as Mr. Kaplan's agreement at issue in this case, that does not establish a general plan but purports to establish benefits for an individual employee or enhance for the particular employee benefits provided by various plans and programs of the employer. The latter interpretation, which is consistent with how the Deputy Commissioner applied IN § 14–139(c), would not appear to "target" employee benefit plans.

State, the plan participant lives in another, and the participant's former spouse lives in a third. In such a situation, administrators might find that plan payments are subject to conflicting legal obligations." 532 U.S. at 148–49, 121 S.Ct. 1322.

In *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), the Supreme Court held that a New Jersey statute that prohibited offsetting workers' compensation payments against pension benefits was preempted. As the Court subsequently explained, "the effect of the statute was to force the employer either to structure all its benefit payments in accordance with New Jersey law, or to adopt different payment formulae for employees inside and outside the State. The employer was therefore required to accommodate conflicting regulatory schemes in devising and operating a system for processing claims and paying benefits—precisely the burden that ERISA pre-emption was intended to avoid." *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 10, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). *See also Shaw v. Delta Air Lines,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (state fair employment law that prohibited discrimination on the basis of pregnancy in employee benefit plans and that required payment of disability benefits was preempted to the extent that it exceeded prohibition and mandates under federal law; otherwise, employers would have to administer plans differently in each state); *Retail Indus. Leaders Ass'n v. Fielder,* 475 F.3d 180 (4th Cir.2007) (state tax incentive scheme designed to encourage employers to increase their level of employee health insurance benefits would subject employers to potentially conflicting rules that would erode their ability to conduct their employee benefits plan nationally).

*Examples of traditional state regulation not subject to preemption*

On the other hand, the Supreme Court and other federal courts have been reluctant to find preemption of traditional state functions. For example, in *New York State Conf. of*

*Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 662, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), the Court upheld a state law creating surcharges on hospital bills that had the effect of incentivizing the choice of certain local insurers over others. It considered in its analysis that pre-emption in that instance would have the effect of preempting all state regulation of hospital charges, an area traditionally regulated by the states. *See also Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (ERISA not intended to preempt state law mechanisms for executing judgments, such as garnishment of payments due beneficiaries); *Boston Children's Heart Found. v. Nadal–Ginard*, 73 F.3d 429 (1st Cir.1996) (state law prohibiting breach of fiduciary duty was not preempted by ERISA where the breach resulted in overpayment in an ERISA account, but did not require resolution of any dispute about the interpretation or administration of the plan).

*Application to IN § 14–139(c) as construed by the final administrative order*

■ As indicated above, it is undisputed that the CareFirst SERP is regulated by ERISA.[23] The final administrative order applying IN § 14–139(c) did not affect the SERP directly. It did not purport to invalidate the SERP, alter its eligibility requirements, or change the method of computing benefits under the plan. Rather, it found unlawful a grant of a service credit in Mr. Kaplan's employment agreement—an agreement that is not itself an ERISA plan. *E.g., Delaye v. Agripac, Inc.*, 39 F.3d 235 (9th Cir.1994) (employment contract

---

**23.** While a SERP qualifies as an ERISA plan, it is generally not subject to the same degree of federal regulation as a traditional pension plan. Many SERPs are for the purpose of providing additional compensation to a select group of highly compensated executives and are left unfunded to avoid many regulatory requirements imposed by ERISA. *See* Paul J. Schneider & Bruce M. Pinheiro, ERISA: A Comprehensive Guide ¶ 6.02 (4th ed. & 2012 Supp.); J.N. Karas, *Keeping Pace with Employee Benefits and Executive Compensation*, Aspatore (May 1, 2013), 2013 WL 1736903. Because the CareFirst SERP plan is unfunded, payments must come from CareFirst's current general assets and not from a separate pension fund.

providing executive with post-termination benefits was not itself an ERISA plan). And that agreement, which incorporates the laws of Maryland, must be interpreted in the light of IN § 14–139(c), a Maryland statute that directly governs agreements between a nonprofit health service plan and its executives.

Whether payment of post-termination benefits based on the SERP under Mr. Kaplan's employment contract is consistent with the criteria of IN § 14–139(c) does not require an interpretation of the SERP or its eligibility requirements. They are clear and indisputable. What is at issue is the validity of a provision in Mr. Kaplan's employment agreement. Plan administrators must, as a matter of course, interpret Mr. Kaplan's employment agreement in order to apply the plan because it is the employment agreement that creates Mr. Kaplan's right to benefit from the plan and that grants him a service credit. But the application of IN § 14–139(c) is unlikely to result in the sort of impact on administration that is the focus of the cases concerning ERISA preemption.

Moreover, IN § 14–139, though recently enacted, affects a domain long subject to state regulation. Its restriction on payments from the company's general funds with respect to the CareFirst SERP is an incidental result of state regulation of nonprofit health service plans and their appropriate use of their public and charitable assets—regulation that inevitably encompasses executive compensation at such entities. As has been affirmed in cases like *Mackey, Travelers,* and *Boston Children's,* traditional state functions are presumed to be unaffected by ERISA, so long as there is no intrusion into the administration of the plan or direct attempt to target plans with regulation. Preemption in this case would be "unsettling." *See Dillingham,* 519 U.S. at 330, 117 S.Ct. 832.[24]

---

**24.** Because we hold that the application of IN § 14–139(c) in this context does not "relate to" an ERISA plan, we need not decide whether it avoids preemption as a state law "which regulates insurance, banking, or securities." 29 U.S.C. § 1144(d)(2)(A).

*Whether the Commissioner's Order was Legally Correct and Supported by Substantial Evidence*

We turn to the question of whether the Commissioner's determination upholding CareFirst's decision to reduce payment under the AIP and eliminate payment under the SERP was legally correct and supported by substantial evidence. As outlined above, the final administrative order concluded that the payment of those post-termination benefits to Mr. Kaplan would not be "for work actually performed for the benefit of [CareFirst]" and would not be "fair and reasonable," thus violating IN § 14-139(c).

*Relevance of the Jews Case*

Both parties have devoted significant attention to the Jews case in which the Circuit Court, affirmed by the Court of Special Appeals, rejected the Commissioner's determination that the aggregate post-termination payment to the former CareFirst CEO was not fair and reasonable or for work actually performed.[25] Like this case, that case also involved the termination of a CareFirst executive and the Commissioner's assessment under IN § 14-139(c) of post-termination payments due under the executive's employment contract. Yet there are critical distinctions between the two cases, both in the nature of the Commissioner's decision and in the facts supporting it.

In the Jews case, the Commissioner discounted the reliance of the CareFirst board on compensation consultants and comparable pay studies[26] and simply halved the total payout

---

**25.** See footnote 8 above.

**26.** These concerns are not peculiar to Maryland. There has been significant controversy over the past decade concerning the use of compensation consultants to justify executive compensation, as well as the use of retirement and other post-employment benefits to enhance executive compensation. *See, e.g., Jones v. Harris Associates, L.P.,* 537 F.3d 728, 730 (7th Cir.2008) (Posner, J., dissenting) (arguing for a reexamination of the basis on which compensation consultants justify executive compensation and for judicial oversight as to reasonableness), *vacated and remanded,* 559 U.S. 335, 130 S.Ct. 1418, 176 L.Ed.2d 265

approved by the board for Mr. Jews without applying the statutory standards to the individual elements of compensation. Here, the final administrative order issued by the Deputy Commissioner affirmed a decision made by the Care-First compensation committee and made careful distinctions that affected only two of the several elements of post-termination compensation. Moreover, unlike Mr. Kaplan, Mr. Jews had worked for CareFirst a sufficient number of years to vest in the SERP without resort to a service credit for time that he had not worked for the company. Thus, the result in the Jews case does not dictate the result in this case.

*Scope of Decision*

It is notable that the CareFirst decision concerning Mr. Kaplan's post-termination compensation that the Commissioner affirmed was more limited in scope than the Commissioner's final administrative decision, as was the Circuit Court's analysis of the application of the statute in its review of the Commissioner's decision. The CareFirst compensation committee, when it declined to pay Mr. Kaplan the benefits in question, determined that payment of SERP benefits and the full-year AIP target amount would not be "for work actually performed"; the CareFirst compensation committee did not reach the question of whether those amounts were "fair and reasonable." Similarly, the Circuit Court, in affirming the Commissioner's application of the statute (before finding that

---

(2010); L.A. Bebchuk & J.M. Fried, *Stealth Compensation via Retirement Benefits*, 1 Berkeley Bus. L.J. 291 (2004).

Legislative and regulatory responses have resulted in enhanced disclosure and additional vehicles for shareholder oversight. *See* Securities and Exchange Commission, Executive Compensation and Related Person Disclosure—Final Rule (November 7, 2006), *codified at* 17 CFR § 229.402; Dodd–Frank Wall Street Reform and Consumer Protection Act, § 951 (shareholder "say on pay"), *codified at* 15 U.S.C. § 78n–1(c). As a result, shareholders have on occasion rejected pay packages agreed to by a corporate board. *See* J. Silver–Greenberg & N.D. Schwartz, *Citigroup's Chief Rebuffed on Pay by Shareholders*, New York Times (April 17, 2012).

As noted above, in the case of a nonprofit health service plan in Maryland, the Commissioner occupies an oversight role that might otherwise fall to the shareholders of a for-profit corporation.

application partially preempted by ERISA), addressed only the question of whether the payments were "for work actually performed" without separately discussing fairness and reasonableness. We agree with the Circuit Court that it is unnecessary to assess whether the payments would be "fair and reasonable" if in fact they were not "for work actually performed." [27]

*"For work actually performed"*

We first review the Deputy Commissioner's construction of IN § 14–139(c) for consistency with the literal language of the statute and with the legislative scheme of which it is a part. *See Willis v. Montgomery County,* 415 Md. 523, 536–37, 3 A.3d 448 (2010). We then assess whether there is substantial evidence to support the administrative application of the statute to the circumstances of this case.

In the final administrative order, the Deputy Commissioner interpreted the requirement that compensation be "for work actually performed for the benefit of [CareFirst]" to mean that post-termination payments must either (a) represent "moneys actually due and owing to the departing employee (*e.g.,* salary, commissions, or deferred compensation)" or (b) provide a benefit to CareFirst and not just to the departing employee. This appears to be a fair construction of the literal language of the statute.

Application to AIP payment

In applying that standard to the AIP, the Deputy Commissioner reasoned that a full target amount based on yearly performance should not be paid when Mr. Kaplan had worked less than half of the year. Accordingly, the Deputy Commissioner upheld CareFirst's decision to pay only a prorated amount of the target AIP amount. There was substantial evidence to support this determination. It appears that,

---

27. The final administrative decision treats these standards as somewhat redundant in that it finds the payments not to be fair and reasonable because they would not be work actually performed for the benefit of CareFirst, among other reasons.

absent a contractual provision to the contrary, CareFirst ordinarily would pay only a prorated share of an AIP to a terminated employee as earned compensation. Although Mr. Kaplan's own compensation expert opined that a full-year payout would be fair, he also indicated that a prorated payment would be the standard practice at most corporations. Moreover, it appears to be undisputed that Mr. Kaplan would not have been entitled to *any* payment under the terms of the 2008 Management Incentive Plan, had he worked for CareFirst for that entire year. The Deputy Commissioner's conclusion that a payment in excess of a prorated amount would not be "for work actually performed" is amply supported by the record.

### *Application to SERP payment*

■ In applying that standard to the SERP, the Deputy Commissioner focused on the nearly 10 years of service credits granted in Mr. Kaplan's employment contract that allowed him to satisfy the number of years of service required to vest in the plan. While the SERP benefits themselves may ordinarily be viewed as a form of deferred compensation for work actually performed by a vested employee, in Mr. Kaplan's situation, the service credits would allow him to receive payments from the SERP without performing that work. Without those service credits, he would not have been entitled to any payment from the SERP at the time of his termination.[28] It is apparent that these service credits were, as Mr. Kaplan's expert testified, an incentive or inducement for employment. A signing bonus is similar in nature to a retention bonus. As outlined above, the standard for application of IN § 14–139(c)

---

28. In his reply brief in this Court, Mr. Kaplan appears to argue that he is entitled to a SERP benefit without resort to the service credit, citing an affidavit of the CareFirst Deputy General Counsel in the record that includes a computation of his potential SERP benefit in which the payout formula is applied against different total years of service. However, the referenced computation "assumes benefits are vested" and it is evident from the vesting provisions of the SERP that Mr. Kaplan would vest only with the addition of the service credit under his employment contract.

was derived from the anti-inurement and anti-bonus provisions of the conversion statute—standards that the Commissioner had applied in the Wellpoint transaction to find that retention bonuses failed that standard.

As the Deputy Commissioner observed, Mr. Kaplan did not have to do anything to earn the service credit—other than sign the employment agreement.[29] It is evident that the credit was unrelated to the actual work performed by Mr. Kaplan, as the amount of credit necessary to qualify for the SERP declined the longer he worked for CareFirst and ultimately its value would disappear.[30] There was substantial evidence to support the Deputy Commissioner's conclusion that the service credits—and, as a corollary, a SERP payment—were not for work actually performed for the benefit of CareFirst.

## Conclusion

For the reasons outlined above, we conclude that (1) the Commissioner's determination that a payment to Mr. Kaplan from the assets of CareFirst pursuant to the SERP would violate Maryland law is not preempted by ERISA; (2) the Commissioner's construction of the requirement of IN § 14–139(c) that compensation be for "work actually performed for the benefit of the corporation" is legally correct; and (3) the final administrative order affirming the decision of CareFirst

---

**29.** Mr. Kaplan argues that all of the benefits provided to him in the employment contract were consideration for the services that he provided to CareFirst and thus was compensation for "work actually performed for the benefit of the corporation." Under that rationale, however, any term agreed to by a board of directors and an employee in an employment contract would necessarily satisfy the statutory standard—effectively eliminating oversight by the Commissioner on that standard.

**30.** For example, if Mr. Kaplan had been terminated after one year with CareFirst he would have needed all of the service credit to vest in the SERP. The longer he worked for CareFirst, the less credit was necessary to vest. Had he worked for CareFirst for 10 years, the service credit would have been without value for vesting.

not to pay a SERP benefit and to pay a prorated AIP benefit is supported by substantial evidence.

JUDGMENT OF CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE DECISION OF THE MARYLAND INSURANCE COMMISSIONER. COSTS TO BE PAID BY APPELLEE.